ELECTRONICALLY FILED
Jefferson County Circuit Court
Lafayette L. Woods, Circuit Clerk
2020-Jul-21 12:23:00
35CV-20-503
C11WD02 : 68 Pages

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS

| | |
|---|---|
| PULASKI COUNTY, AR; | CASE NO. |
| JEFFERSON COUNTY, AR; | |
| *Plaintiffs,* | **JURY TRIAL** |
| | **DEMANDED** |
| *v.* | |
| | |
| WALMART INC., F/K/A WAL-MART STORES, | |
| INC., WAL-MART STORES EAST, LP, WSE | |
| MANAGEMENT, LLC, WSE INVESTMENT LLC, | |
| WAL-MART STORES EAST, INC.; | |
| *Defendants.* | |

1

Table of Contents

**COMPLAINT**...........................................................................................................................3

**I.   PRELIMINARY STATEMENT** ....................................................................................3

**II.   PARTIES** ..........................................................................................................................9

**III.   JURISDICTION AND VENUE** ..................................................................................11

**IV.   FACTUAL ALLEGATIONS** ......................................................................................11

   A.   Opioids and Their Effects ..........................................................................................11

   B.   Walmart's Conduct Created an Abatable Public Nuisance...........................................14

   C.   Walmart Deliberately Disregarded Its Duties to Maintain Effective Controls Against Diversion. 14

      **1.   Walmart was on Notice of and Contributed to Illegal Diversion of Prescription Opioids**. 14

      **2.   Walmart Has a Duty to Report Suspicious Orders and Not Ship Those Orders Unless Due Diligence Disproves Its Suspicions**....................................................................................17

      **3.   Walmart was Aware of and Has Acknowledged Its Obligations to Prevent Diversion and to Report and Take Steps to Halt Suspicious Orders.** ...................................................24

      **4.   Walmart is Uniquely Positioned to Guard Against Diversion.** ...........................................30

      **5.   Walmart Failed to Maintain Effective Controls Against Diversion.** ...................................30

   D.   Walmart Performance Metrics Put Profits Before Safety. .............................................42

   E.   Walmart Fraudulently Concealed Its Misconduct........................................................45

   F.   By Ignoring Mandatory Obligations To Report Suspicious Orders And Guard Against Diversion, Walmart Fueled The Opioid Epidemic And Significantly Harmed The Counties And Their Residents 46

**V. CAUSES OF ACTION** .........................................................................................................49

**COUNT I** ...............................................................................................................................49

**COUNT II** ..............................................................................................................................54

**COUNT III**.............................................................................................................................57

**COUNT IV**.............................................................................................................................59

**COUNT V** ..............................................................................................................................61

**COUNT VI**.............................................................................................................................62

**COUNT VII** ...........................................................................................................................64

**PRAYER FOR RELIEF**........................................................................................................66

## COMPLAINT
## I. PRELIMINARY STATEMENT

1.    Plaintiffs, Jefferson County and Pulaski County, Arkansas, ("the Counties") bring this action to redress the unfettered and unlawful distribution and dispensing of opioids into the Counties by Walmart.

2.    Walmart was responsible for much of the opioids purchased, and by extension, dispensed, in Arkansas from 2006 to 2014, the years for which ARCOS data is available.[1,2] Between 2006 and 2014, Walmart shipped 242,875,451 dosage units of opioids to Arkansas stores and purchased 249,220,464 dosage units of opioids in Arkansas, more than any other pharmacy in the state, with just over three million residents. (A dosage unit is a single pill, capsule, patch, or other form of administering opioids.) Walmart supplied much of the enormous volume of opioids it distributed itself.

3.    Prescription opioids are narcotics. They are derived from and possess properties similar to opium and heroin, and they are regulated as controlled substances. While opioids can dampen the perception of pain, they also can create a euphoric high and are highly addictive. At higher doses, they can slow the user's breathing, causing potentially fatal respiratory depression. Because the medical community recognized these dangers, they originally used opioids cautiously and sparingly, typically only for short-term acute pain or for palliative (end-of-life) care. Consequently, the prescribing of opioids was sharply constrained.

---

[1]  The federal Drug Enforcement Administration ("DEA") maintains a system of records, known as the "Automated Records and Consolidated Orders System/Diversion Analysis and Detection System (ARCOS/DADS)," to which all distributors and pharmacy purchasers of controlled substances are required to report each transaction in these drugs. These companies have typically opposed disclosure of the information contained in the system, often referred to as "ARCOS data," arguing that it belongs to them as trade secrets. Data for the years 2006 to 2014, however, has been disclosed to the Plaintiffs and also made public through other litigation against Walmart and others.

[2]  The opioid purchases disclosed in the ARCOS data serve as an effective proxy for the opioids dispensed by the retail pharmacies, which have no incentive to purchase drugs they do not plan to sell.

4.    In the mid-1990s, however, pharmaceutical companies aggressively and deceptively marketed opioids for common chronic conditions like back pain, migraines, and arthritis. By the mid-2000s, chronic opioid therapy—the prescribing of opioids long-term to treat chronic pain—became widespread and the use of opioids skyrocketed.[3] According to the CDC opioid prescriptions, as measured by number of prescriptions and morphine milligram equivalents ("MME") per person, tripled from 1999 to 2015. In 2015, on an average day, more than 650,000 opioid prescriptions were dispensed in the U.S.

5.    Taking advantage of this mass market, Walmart flooded many communities with opioids, without conducting the due diligence required by law to prevent the diversion of opioids to an illicit market in these drugs that predictably developed and that Walmart helped create, expand, and maintain. Walmart occupied two positions on the opioid supply chain: distributor, delivering opioids to its pharmacies, and dispenser, filling prescriptions of opioids through its own pharmacies and delivering opioids to the ultimate consumers. Because of its vertically integrated structure, Walmart was uniquely capable of determining whether it was facilitating the diversion of prescription opioids it distributed and sold.

6.    Walmart has a duty under Arkansas law, as well as federal law, to maintain effective controls to prevent diversion and to monitor and report, and reject suspicious orders of controlled substances. Such orders include, for example, orders of opioids that exceed reasonable volume, are of an unusual frequency, or that raise other red flags. The same is true of dispensers, which likewise must have systems in place to guard against diversion of the drugs they buy and sell. Walmart had a second chance to act as a last line of defense against supplying an illicit market at the retail level. Instead, it put its profits ahead of its obligation to have systems in place to spot

---

[3] In this Complaint, "chronic pain" means non-cancer pain lasting three months or longer.

red flags and halt suspicious prescriptions, compounding the harm the company was causing in the Counties.

7.     Data available to Walmart, as well as its own observations, would have, or should have, put the company on notice of potential diversion. Yet, upon information and belief, Walmart consistently failed to guard against diversion of the opioids it distributed and sold, and even put policies in place that undermined its obligations, deepening the crisis of opioid abuse, addiction, and death in the Counties.

8.     Abuse and addiction are the natural by-products of the over-supply of opioids saturating Arkansas. Opioids are highly addictive, and repeated exposure has been noted to cause structural changes in the brain that lead to addiction.[4] Research conducted at the University of Arkansas for Medical Sciences has shown just how dangerous even short-term exposure to opioids can be, finding that "[t]he probability of long-term opioid use increases most sharply in the first days of therapy," and "the chances of chronic use begin to increase after the third day [of opioid] supplied and rise rapidly thereafter."[5]

9.     Prescription opioids have precipitated a full-blown national epidemic. Nationally, the number of deaths due to drug overdoses rose from 16,849 in 1999 to 63,632 in 2016. In 2017, there were 70,237, opioid-related deaths, a 9.6% increase from 2016. The United States Center for Disease Control ("CDC") estimates that the number of deaths associated with the opioid crisis were even higher in 2018.

10.    The overwhelming availability of opioids also has taken its toll on Arkansas in a

---

[4] Kolodny, et al., *The Prescription Opioid and Heroin Crisis: A Public Health Approach to an Epidemic of Addiction* at 560-561.

[5] Anuj Shah, Corey J. Hayes & Bradley C. Martin, *Characteristics of Initial Prescription Episodes and Likelihood of Long-Term Opioid Use*, 66 CDC Morbidity and Mortality Weekly Report 265 (March 17, 2017), *available at* https://www.cdc.gov/mmwr/volumes/66/wr/mm6610a1.htm (last visited Feb. 9, 2018).

variety of ways. In 2018, nearly half of 444 reported deaths involving drug use in Arkansas involved opioids. Additionally, intravenous drug use has affected HIV rates in Arkansas. In 2017, approximately 5,634 Arkansas residents were HIV-positive. Approximately 15.1% of male HIV cases, and 17.1% of female HIV cases were attributed to intravenous drug use.[6]

11. In 2010, the national county average of opioid prescriptions written were 87.2 prescriptions per 100 residents. In Jefferson County, 92.8 opioid prescriptions were written for every 100 County residents and in Pulaski County, 122.8 opioid prescriptions were written for every 100 County residents- both above the national average. In 2015, the national county average of opioid prescriptions written were 94.3 prescriptions per every 100 residents. In Jefferson County, 112.4 opioid prescriptions were written per every 100 County residents and in Pulaski County 111.6 prescriptions were written for every 100 County residents. In 2017, the national county average of opioid prescriptions written were 94 opioid prescriptions for every 100 County residents. In Jefferson County 103.8 opioid prescriptions were written for every 100 residents and in Pulaski County 98.3 prescriptions were written for every 100 residents. Upon information and belief, Walmart distributed and dispensed many of these prescriptions, and such a trend is just one example of how opioids have impacted the Counties.

12. In addition to the direct problems of adult addiction, abuse, and overdose, the opioid epidemic has created a ripple effect, touching lives across all age groups and straining public resources. Increased opioid use has been linked with increased emergency room visits for opioid-related problems and an increase in neonatal abstinence syndrome ("NAS").[7] NAS is a

---

[6] https://www.drugabuse.gov/drugs-abuse/opioids/opioid-summaries-by-state/arkansas-opioid-summary
[7] Kolodny, et al., *The Prescription Opioid and Heroin Crisis: A Public Health Approach to an Epidemic of Addiction*, at 560-561.

constellation of symptoms resulting from drug use during pregnancy.[8] Opioid use by pregnant women increases the risk of NAS,[9] which increases the risk of pregnancy complications, including maternal death and stillbirth.[10] The rate of NAS diagnosis in Arkansas increased more than ten-fold between 2000 and 2014.[11] Babies diagnosed with NAS spend five times more days in the hospital, and medical care costs increase ten-fold as compared to babies born without NAS.[12]

13.    Older children have also been affected. Presently "Arkansas ranks first in the nation for ages 12 to 17 in misuse of painkillers."[13] According to the Arkansas State Drug Director, Kirk Lane, opioid use is common among Arkansas children.  When addressing a group of Arkansas Department of Human Services Division of County Operations administrators he stated, "[u]nfortunately, it's commonplace for kids to also use opioids," and recalled an incident where an Arkansas mother inadvertently touched fentanyl while cleaning her son's room, and immediately passed out.[14]  For each age group, Arkansas ranks in the top 20 states for opioid abuse.[15]

14.    In addition, the opioid epidemic is driving a dramatic increase in the number of children entering foster care.[16] The number of children in the Arkansas foster care system has

---

[8] Arkansas Department of Health, *Neonatal Abstinence Syndrome in Arkansas 2000–2014, available at* http://www.arkansaspmp.com/files/2017/NAS_Report_Final.pdf (last visited Feb. 9, 2018).

[9] Arkansas Department of Health. Arkansas Department of Health, *Prescription Monitoring Program Annual Report January-December 2016, available at* http://www.arkansaspmp.com/files/2017/2016_Annual_Report_FINAL.pdf (last visited Feb. 9, 2018).

[10] Ayumi Maeda, Brian T. Bateman, Caitlin Clancy, Andreea Creanga, Lisa Leffert, *Opioid Abuse and Dependence during Pregnancy: Temporal Trends and Obstetrical Outcomes,* 121 ANESTHESIOLOGY 1158 (Dec. 2014).

[11] Arkansas Department of Health, *supra* note 8.

[12] Id.

[13] Wesley Brown, *Arkansas at front line of U.S. opioid epidemic,* TALK BUSINESS & POLITICS (Sept. 13, 2017), *available at* https://talkbusiness.net/2017/09/arkansas-at-front-line-of-u-s-opioid-epidemic (last visited Feb. 9, 2018).

[14] https://humanservices.arkansas.gov/newsroom/featured_details/arkansass-opioid-epidemic-affects-kids-as-well

[15] Arkansas Department of Human Services, *State Targeted Response to Opioid Crisis.*

[16] Teresa Wiltz, *Drug Addiction Epidemic Creates Crisis in Foster Care.* STATELINE (Oct. 7, 2016), *available at* http://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2016/10/07/drug-addiction-epidemic-creates-crisis-in-foster-care (last visited Feb. 13, 2018).

spiked, growing from 3,806 in 2015 to 5,209 as of September 28, 2016.[17] Drug-endangered children are at increased risk of injury, death, physical and sexual assault, neglect, and perpetuation of the cycles of drug and child abuse.[18] In the 4th quarter of the State's 2017 fiscal year, over half of children placed into the foster care system were placed because of substance abuse by parents—and the vast majority of which involve drug abuse including prescription opioid abuse.[19] The same was true each quarter before that—55% of entries into the foster care system in the 3rd quarter were due to parental substance abuse,[20] 57% in the 2nd quarter,[21] and 53% in the 1st quarter.[22]

15.     The fallout from the prescription opioid epidemic has also spawned a public health and criminal justice crisis stemming from increased use of heroin. Opioid users graduate from prescription pills to heroin because it is cheaper, available, and it affects the same brain receptors to provide feelings of euphoria similar to prescription opioids.[23] Three in four heroin users also report use of prescription opioids,[24] and 80% of current heroin users report that their opioid use

---

[17] State Targeted Response (STR) to Opioid Crisis citing Brawner S. *Director: Foster spike's cause hard to pinpoint; some caseworkers erring on side of removal,* TALK BUSINESS & POLITICS (Nov. 29, 2016), *available at* https://talkbusiness.net/2016/11/director-foster-spikes-cause-hard-to-pinpoint-some-caseworkers-erring-on-side-of-removal/ (last visited Feb. 13, 2018).

[18] Department of Justice, Office of Public Affairs, *Keeping Them Safe: The Task Force on Drug Endangered Children* (Aug. 17, 2010).

[19] Hornby Zeller Associates, Inc., *Quarterly Performance Report, 4th Quarter SFY 2017*, at 11 (produced for Arkansas Department of Health, Division of Children and Family Services), *available at* http://humanservices.arkansas.gov/images/uploads/dcfs/4th_Qtr_QPR_SFY_2017_FINAL.pdf (last visited Feb. 9, 2018).

[20] Hornby Zeller Associates, Inc., *Quarterly Performance Report, 3rd Quarter SFY 2017*, at 11 (produced for Arkansas Department of Human Services, Division of Children and Family Services http://humanservices.arkansas.gov/images/uploads/dcfs/3rd_Qtr_QPR_SFY_2017_FINAL.pdf (last visited Feb. 9, 2018).

[21] Hornby Zeller Associates, Inc., *Quarterly Performance Report, 2nd Quarter SFY 2017*, at 11 (produced for Arkansas Department of Human Services, Division of Children and Family Services http://humanservices.arkansas.gov/images/uploads/dcfs/2nd_Qtr_SFY_2017_FINAL.pdf (last visited Feb. 9, 2018).

[22] Hornby Zeller Associates, Inc., *Quarterly Performance Report, 1st Quarter SFY 2017*, at 11 (produced for Arkansas Department of Human Services, Division of Children and Family Services http://humanservices.arkansas.gov/images/uploads/dcfs/1st%20Qtr%20SFY%202017%20FINAL.pdf (last visited Feb. 9, 2018).

[23] Id.

[24] Id.

8

began with prescription opioids.[25] The CDC reports that overdose deaths involving heroin have more than tripled in the last four years, and the opioid epidemic is largely to blame.[26] In Arkansas, heroin use has been increasing every year.[27] Arkansas has seen the number of heroin-related hospitalizations increase more than eight-fold, from 42 in 2011 to 364 in 2015.[28]

16. Recently, the Drug Enforcement Administration ("DEA")'s Little Rock office and various Arkansas law enforcement agencies took part in the "Operation Pilluted" campaign targeting abuse of prescription opioids in Arkansas, which former U.S. Attorney Christopher Thyer branded as "perhaps the greatest drug problem Arkansas currently faces."[29]

17. Despite law enforcement efforts, prescription opioids continue to flood the State of Arkansas and Plaintiff Counties, and the epidemic of addiction and overdose continues to plague their citizens.

18. Accordingly, the Counties bring this action to hold Walmart accountable for its conduct and seek abatement, civil penalties, damages, and any other injunctive and equitable relief within this Court's powers to redress and halt these unlawful practices.

## II. PARTIES

19. Plaintiff, Pulaski County, Arkansas is a political subdivision of the State of Arkansas pursuant to ARK. CODE ANN. § 14-14-102. This suit is authorized by the Pulaski County Judge to be brought in the name of Pulaski County pursuant to ARK. CODE ANN. § 14-16-101.

---

[25] Kolodny, et al., *The Prescription Opioid and Heroin Crisis: A Public Health Approach to an Epidemic of Addiction*, at 560-561.

[26] Theodore Cicero, Matthew Ellis, Hilary Surratt, *The Changing Face of Heroin Use in the United States,* 71 J. AM. MED. ASSOC. 821 (July 2014).

[27] *Arkansas Department of Human Services, State Targeted Response to Opioid Crisis.*.

[28] Id.

[29] Department of Justice, U.S. Attorney's Office, Eastern District of Arkansas, *140 Charged In Arkansas As Part of National Prescription Drug Initiative* (May 20, 2015), *available at* https://www.justice.gov/usao-edar/pr/140-charged-arkansas-part-national-prescription-drug-initiative (last visited Feb. 4, 2018).

20.     Plaintiff, Jefferson County, Arkansas is a political subdivision of the State of Arkansas pursuant to ARK. CODE ANN. § 14-14-102. This suit is authorized by the Jefferson County Judge to be brought in the name of Jefferson County pursuant to ARK. CODE ANN. § 14-16-101.

21.     Pulaski County and Jefferson County are collectively referred to as "the Counties" throughout the Complaint.

22.     Defendant Walmart Inc., formerly known as Wal-Mart Stores, Inc., is a Delaware corporation with its principal place of business in Bentonville, Arkansas.

23.     Defendant Wal-Mart Stores East, LP is a Delaware limited partnership with its principle place of business in Arkansas.

24.     Defendant WSE Management, LLC, is a Delaware limited liability company, and owns one percent of Wal-Mart Stores East, LP.

25.     Defendant WSE Investment, LLC, is a Delaware limited liability company, and a ninety-nine percent of Wal-Mart Stores East, LP.

26.     The sole owner of both WSE Management, LLC and WSE Investment, LLC is Walmart-Stores East Inc., an Arkansas corporation.

27.     The sole shareholder of Wal-Mart Stores East, Inc. is Walmart Inc., f/k/a Wal-Mart Stores, Inc.

28.     Defendants Walmart Inc., f/k/a Wal-Mart Stores, Inc., Wal-Mart Stores East, LP, WSE Management, LLC, WSE Investment LLC, Wal-Mart Stores East, Inc. are collectively referred to as "Walmart."

10

29.     Walmart, through its various DEA registrant subsidiaries and affiliated entities, during the relevant time period, conducted business as a registered wholesale distributor and as a pharmacy.

30.     At all times relevant to this Complaint, Walmart distributed and sold prescription opioids throughout the United States, including in Arkansas and Pulaski and Jefferson Counties specifically.

## III.   JURISDICTION AND VENUE

31.     This Court has jurisdiction over this matter pursuant to ARK. CODE ANN. § 16-13-201. The instant Complaint does not confer diversity jurisdiction upon the federal courts pursuant to 28 U.S.C. § 1332 because both Counties and Walmart are citizens of Arkansas.

32.     Venue is proper in this Court pursuant to ARK. CODE ANN. § 16-60-101(a) and (c) because the Counties are the counties in which a substantial part of the events or omissions giving rise to these claims occurred; and Counties assert rights to relief against Walmart, and arising out the same transaction or occurrence, and common questions of law or fact will predominate over individual questions of law or material fact to each County, this action can be maintained more efficiently and economically for all parties than if prosecuted separately, and the interests of justice support joinder of Counties in one action.

## IV. FACTUAL ALLEGATIONS

### A.     Opioids and Their Effects

33.     The term "opioid" refers to a class of drugs that bind with opioid receptors in the brain and includes natural, synthetic, and semi-synthetic opioids. Natural opioids are derived from the opium poppy. Generally used to treat pain, opioids produce multiple effects on the human body, the most significant of which are analgesia, euphoria, and respiratory depression.

11

34.    The medicinal properties of opioids have been recognized for millennia—as well as their potential for abuse and addiction. The opium poppy contains various opium alkaloids, three of which are used in the pharmaceutical industry today: morphine, codeine, and thebaine. Early use of opium in Western medicine was with a tincture of opium and alcohol called laudanum, which contains all of the opium alkaloids and is still available by prescription today. Chemists first isolated the morphine and codeine alkaloids in the early 1800s.

35.    In 1827, the pharmaceutical company Merck began large-scale production and commercial marketing of morphine. During the American Civil War, field medics commonly used morphine, laudanum, and opium pills to treat the wounded, and many veterans were left with morphine addictions. By 1900, an estimated 300,000 people were addicted to opioids in the United States, and many doctors prescribed opioids solely to prevent their patients from suffering withdrawal symptoms. The nation's first Opium Commissioner, Hamilton Wright, remarked in 1911, "The habit has this nation in its grip to an astonishing extent. Our prisons and our hospitals are full of victims of it, it has robbed ten thousand businessmen of moral sense and made them beasts who prey upon their fellows . . . it has become one of the most fertile causes of unhappiness and sin in the United States."[30]

36.    In 1898, Bayer Pharmaceutical Company began marketing diacetylmorphine (obtained from acetylation of morphine) under the trade name "Heroin." Bayer advertised heroin as a non-addictive cough and cold remedy suitable for children, but as its addictive nature became clear, heroin distribution in the U.S. was limited to prescription only in 1914 and then banned altogether a decade later.

---

[30] Nick Miroff, *From Teddy Roosevelt to Trump: How Drug Companies Triggered an Opioid Crisis a Century Ago*, The Wash. Post (Oct. 17, 2017), https://www.washingtonpost.com/news/retropolis/wp/2017/09/29/the-greatest-drug-fiends-in-the-world-an-american-opioid-crisis-in-1908/?utm_term=.7832633fd7ca.

12

37.     Although heroin and opium became classified as illicit drugs, there is little difference between them and prescription opioids. Prescription opioids are synthesized from the same plant as heroin, have similar molecular structures, and bind to the same receptors in the human brain.

38.     Due to concerns about their addictive properties, prescription opioids have usually been regulated at the federal level as Schedule II controlled substances by the U.S. Drug Enforcement Administration ("DEA") since 1970.

39.     Medical professionals describe the strength of various opioids in terms of morphine milligram equivalents ("MME"). According to the CDC, doses at or above 50 MME/day double the risk of overdose compared to 20 MME/day, and one study found that patients who died of opioid overdose were prescribed an average of 98 MME/day.

40.     Patients develop tolerance to the analgesic effect of opioids relatively quickly. As tolerance increases, a patient typically requires progressively higher doses in order to obtain the same perceived level of pain reduction. The same is true of the euphoric effects of opioids—the "high." However, opioids depress respiration, and at very high doses can and often do arrest respiration altogether. At higher doses, the effects of withdrawal are more severe. Long-term opioid use can also cause hyperalgesia, a heightened sensitivity to pain.

41.     Discontinuing opioids after more than just a few weeks will cause most patients to experience withdrawal symptoms. These withdrawal symptoms include: severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, hallucinations, delirium, pain, and other serious symptoms, which may persist for months after a complete withdrawal from opioids, depending on how long the opioids were used.

**B.     Walmart's Conduct Created an Abatable Public Nuisance**

42.     As alleged throughout this Complaint, Walmart's conduct created a public health crisis and a public nuisance.

43.     The public nuisance—i.e., the opioid epidemic—created, perpetuated, and maintained by Walmart can be abated and further recurrence of such harm and inconvenience can be abated by, *inter alia*, (a) providing addiction treatment to patients who are already addicted to opioids; and (b) making naloxone widely available so that overdoses are less frequently fatal.

44.     Walmart has the ability to act to abate the public nuisance, and the law recognizes that they are uniquely well positioned to do so. All companies in the supply chain of a controlled substance are primarily responsible for ensuring that such drugs are only distributed and sold to appropriate patients and not diverted. These responsibilities exist independent of any Food and Drug Administration ("FDA") or Drug Enforcement Administration ("DEA") regulation, to ensure that their products and practices meet both federal and state laws and regulations. As registered distributors and dispensers of controlled substances, Walmart is placed in a position of special trust and responsibility and is uniquely positioned, based on its knowledge of prescribers and orders, to act as a key line of defense. Instead, Walmart abused its position of special trust and responsibility within the closed system of opioid distribution and dispensing and fostered a black market for prescription opioids.

**C.     Walmart Deliberately Disregarded Its Duties to Maintain Effective Controls Against Diversion.**

> **1.     Walmart was on Notice of and Contributed to Illegal Diversion of Prescription Opioids.**

45.     Upon information and belief, Walmart profited from the sale of opioids in its stores, and relied on opioids to meet customer demand and drive more traffic to its stores. Walmart was keenly aware of the oversupply of prescription opioids through the extensive data and information

14

it developed and maintained as both a distributor and retail seller of opioids. Yet, instead of taking any meaningful action to stem the flow of opioids into communities, it continued to participate in the oversupply and profit from it.

46. Walmart does substantial business across Arkansas and the United States. This business has included the distribution and sale of prescription opioids.

47. Statewide ARCOS data confirms that Walmart distributed and dispensed substantial quantities of prescription opioids, including fentanyl, hydrocodone, and oxycodone in the Counties. In addition, it distributed and dispensed substantial quantities of prescription opioids in other states, and these drugs were diverted from these other states to the Counties. Walmart failed to take meaningful action to stop this diversion despite its knowledge of it, and thus contributed substantially to the oversupply and diversion of opioids in the Counties.

48. Walmart developed and maintained extensive data on opioids it distributed and dispensed. Through this data, Walmart had direct knowledge of patterns and instances of improper distribution, prescribing, sale, and use of prescription opioids in communities throughout the country, and in the Counties in particular. Upon information and belief, it used the data to evaluate its own sales activities and workforce. Walmart's data is a valuable resource that it could and should have used to help stop diversion, but it failed to do so.

49. In sum, Walmart facilitated the supply of far more opioids than could have been justified to serve a legitimate market. The failure of Walmart to maintain effective controls, and to investigate, report, and take steps to halt orders that it knew or should have known were suspicious, as well as to maintain effective policies and procedures to guard against diversion from its retail stores, breached both its statutory and common law duties.

15

50.     As laid out below, each participant in the supply chain of opioid distribution, including Walmart, is responsible for preventing diversion of prescription opioids into the illegal market by, among other things, monitoring, and reporting suspicious activity and orders of opioids. Distributors also must decline to fill suspicious orders, including when those orders are placed by their own pharmacies. That is, of course, especially appropriate given that a chain pharmacy like Walmart has, and can command, detailed information about its own stores to identify, investigate, and address potential diversion.

51.     In fact, Walmart systemically ignored red flags that it was fueling a black market, and failed to maintain effective controls against diversion at both the wholesale and pharmacy level.   Walmart put profits over the public health and safety. Despite its legal obligations as registrants under the CSA and Arkansas law, Walmart allowed widespread diversion to occur— and did so knowingly.

52.     Upon information and belief, this problem was compounded by Walmart's failure to adequately train its pharmacists and pharmacy technicians on how to handle prescriptions for opioid painkillers, including what constitutes a proper inquiry into whether a prescription is legitimate and what measures and/or actions to take when a prescription is identified as potentially illegitimate.

53.     Upon information and belief, Walmart also failed to put in place effective policies and procedures to prevent its stores from facilitating diversion and selling into a black market, and to conduct adequate internal or external reviews of its opioid sales to identify patterns regarding prescriptions that should not have been filled, or if it conducted such reviews, it failed to take any meaningful action as a result.

16

54. Upon information and belief, even where Walmart enacted policies and procedures to prevent stores from facilitating diversion and selling into a black market, such policies were merely window-dressing and were not employed in any meaningful way.

55. Walmart put in place policies that required and rewarded speed and volume of its pharmacists over safety and the care necessary to ensure that narcotics were distributed and sold lawfully.

56. Walmart was, or should have been, fully aware that the quantity of opioids being distributed and dispensed by it was untenable, and in many areas patently absurd; yet, it did not take meaningful action to investigate or to ensure that it was complying with its duties and obligations under the law with regard to controlled substances.

### 2. Walmart Has a Duty to Report Suspicious Orders and Not Ship Those Orders Unless Due Diligence Disproves Its Suspicions.

57. Multiple sources impose duties on Walmart to report suspicious orders and to not ship those orders unless due diligence disproves those suspicions.

58. First, under the common law, Walmart had a duty to exercise reasonable care in distributing dangerous narcotic substances. By flooding Arkansas, and the Counties, with more opioids than could be used for legitimate medical purposes, by filling and failing to report orders that it knew or should have realized were likely being diverted for illicit uses, and by failing to maintain effective controls against diversion from its retail stores, Walmart breached that duty and both created and failed to prevent a foreseeable risk of harm.

59. Second, Walmart had a duty to comply with Arkansas controlled substances laws (which largely mirror federal law) and federal controlled substances laws. Recognizing a need for greater scrutiny over controlled substances due to their potential for abuse and danger to public health and safety, the United States Congress enacted the Controlled Substances Act ("CSA") in

17

1970. The CSA and its implementing regulations created a closed-system of distribution for all controlled substances and listed chemicals. Congress was concerned with the diversion of drugs out of legitimate channels of distribution and acted to halt the "widespread diversion of [controlled substances] out of legitimate channels into the illegal market." The closed-system was specifically designed to ensure that there are multiple ways of identifying and preventing diversion through active participation by registrants within the drug delivery chain. All registrants—which includes all distributors of controlled substances and pharmacies dispensing controlled substances—must adhere to the specific security, recordkeeping, monitoring, and reporting requirements that are designed to identify or prevent diversion. When the supply chain participants at any level fail to fulfill their obligations, the necessary checks and balances collapse. The result is the scourge of addiction that has occurred.

60.     Under Arkansas law and the CSA, distributors and chain pharmacies are required to register to distribute and/or dispense controlled substances. *See* ARK. ADMIN. CODE § 007.07.2-I; 21 U.S.C. § 823(a)-(b), (e); 28 C.F.R. § 0.100; 28 C.F.R. § 1301.71. As registrants, Walmart was required to "maint[ain] . . . effective controls against diversion" and to "design and operate a system to disclose . . . suspicious orders of controlled substances." 21 U.S.C. § 823(a)-(b); 21 C.F.R. § 1301.74. In addition, Walmart was required to not ship, or fill, suspicious orders or prescriptions until it determined that the prescriptions or orders were not likely to be diverted.

61.     Additionally, Arkansas law requires each registrant to maintain on a current basis a complete and accurate record of each substance manufactured, imported, received, sold, delivered, exported, or otherwise disposed of. *See* ARK. CODE ANN. § 20-64-209. It is a violation of Arkansas law for any person to negligently fail to abide by the recordkeeping and reporting requirements. Walmart also has independent duties under Arkansas law, which requires

distributors and pharmacies, as a condition of registration, to maintain effective controls against diversion of controlled substances into other than legitimate medical, scientific, and industrial channels. ARK. ADMIN. CODE § 007.07.2-II-III.

62.     Further, under the CSA and Arkansas law, pharmacy registrants are required to "provide effective controls and procedures to guard against theft and diversion of controlled substances." *See* 21 C.F.R. § 1301.71(a).   In addition, 21 C.F.R. § 1306.04(a) states, "[t]he responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription."  Thus, regardless of whether they are registrants, all dispensers must ensure that prescriptions of controlled substances are "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a).  The DEA has recognized that "as dispensers of controlled substances, pharmacists and pharmacy employees are often the last line of defense in preventing diversion."[31]

63.     Under the CSA, the duty to prevent diversion lies with Walmart, not the individual pharmacist.  As such, although it acts through its agents, the pharmacy is ultimately responsible to prevent diversion, as described above.[32]  Further, as described above, the obligations under the controlled-substances laws extend to any entity selling prescription opioids, whether it is the registration-holder or not.

---

[31] 2012 Dear Registrant letter to pharmacy registrants, http://ppsconline.com/articles/2012/FL_PDAC.pdf

[32] *The Medicine Shoppe; Decision and Order*, 79 FR 59504, 59515 (DEA Oct. 2, 2014)  (emphasis added); *see also Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195*; Decision and Order, 77 FR 62316-01 ("When considering whether a pharmacy has violated its corresponding responsibility, the Agency considers whether the entity, not the pharmacist, can be charged with the requisite knowledge."); *Top RX Pharmacy*; Decision and Order, 78 FR 26069, 62341 (DEA Oct. 12, 2012) (same); *cf. Jones Total Health Care Pharmacy LLC and SND Health Care LLC v. Drug Enforcement Administration*, 881 F.3d 82 (11th Cir. 2018) (revoking pharmacy registration for, *inter alia*, dispensing prescriptions that prescriptions presented various red flags, i.e., indicia that the prescriptions were not issued for a legitimate medical purpose without resolving red flags).

64.     In designing and maintaining a system to disclose suspicious orders, registrants are not entitled to be passive (but profitable) observers, but rather "shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant." *Id.* Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency. *Id.* Other red flags may include, for example, "[o]rdering the same controlled substance from multiple distributors."

65.     These criteria are disjunctive and are not all inclusive. For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious. Likewise, a distributor need not wait for a normal pattern to develop over time before determining whether a particular order is suspicious. The size of an order alone, regardless of whether it deviates from a normal pattern, is enough to trigger the responsibility to report the order as suspicious. The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer but also on the patterns of the entirety of the customer base and the patterns throughout the relevant segment of the industry. For this reason, identification of suspicious orders serves also to identify excessive volume of the controlled substance being shipped to a particular region.

66.     The DEA has testified in the MDL that:

   a. DEA registrants are required to block all suspicious orders of prescription opioids.[33]

   b. Shipping a suspicious order is a per se violation of federal law.[34]

   c. If a wholesale distributor blocks a suspicious order, they should terminate all future sales to that same customer until they can rule out that diversion is occurring.[35]

---

[33] *See* Prevoznik Dep. Vol II, 770:6 to 771:20, April 18, 2019 (DEA 30(b)(6) designee).

[34] *Id.* at 632:7 to 633:2.

[35] *Id.* at 628:24 to 629:15.

d. After the fact reporting of suspicious orders has never been in compliance with federal law.[36]

67.     Of course, due diligence efforts must be thorough: "the investigation must dispel all red flags indicative that a customer is engaged in diversion to render the order non-suspicious and exempt it from the requirement that the distributor 'inform' the [DEA] about the order. Put another way, if, even after investigating the order, there is any remaining basis to suspect that a customer is engaged in diversion, the order must be deemed suspicious and the Agency must be informed."[37] Indeed, the DEA may revoke a distributor's certificate of registration as a vendor of controlled substances if the distributor identifies orders as suspicious and then ships them "without performing adequate due diligence."[38]

68.     To comply with the law, wholesale distributors, including Walmart, must know their customers and the communities they serve. Each distributor must "perform due diligence on its customers" on an "ongoing [basis] throughout the course of a distributor's relationship with its customer." *Masters Pharms., Inc.*, 80 Fed. Reg. 55,418, 55,477 (DEA Sept. 15, 2015), *petition for review denied*, 861 F.3d 206 (D.C. Cir. 2017).

69.     In addition to its duties as a distributor, Walmart also had a duty to perform adequate due diligence and design and implement systems to prevent diversion of controlled substances in its retail pharmacy operations. As acknowledged in an article published by a different chain pharmacy in the New England Journal of Medicine, "[p]harmacies have a role to play in the oversight of prescriptions for controlled substances, and opioid analgesics in

---

[36] *Id.* at 673:7 to 674:13, 679:20 to 680:8.

[37] *Masters Pharmaceuticals, Inc.*, Decision and Order, 80 Fed. Reg. 55418-01 at *55477 (DEA Sept. 15, 2015).

[38]     *Masters Pharmaceuticals*, 861 F.3d at 212. The *Decision and Order* was a final order entered by the DEA revoking Masters Pharmaceutical's certificate of registration, without which Masters Pharmaceutical could not sell controlled substances. In *Masters Pharmaceutical*, the D.C. Circuit Court of Appeals denied a petition for review, leaving intact the DEA's analysis and conclusion in the *Decision and Order*.

21

particular." Mitch Betses, R.Ph., and Troyen Brennan, M.D., M.P.H., *Abusive Prescribing of Controlled Substances - A Pharmacy View*, N. ENGL. J. MED. 369;11, Sept. 12., 2013, at 989-991. The DEA has identified "both pharmaceutical distributors and chain pharmacies as part of the problem" contributing to opioid abuse and related deaths. *Id.*

70.     Walmart has a particular "advantage" in meeting its obligations under the CSA because its entities can use "aggregated information on all prescriptions filled at the chain" in order to examine "patterns" of opioids and other "high-risk drugs" and target "inappropriate prescribing." *Id.* at 990. For example, a chain pharmacy should properly use its chainwide dispensing data to identify "high risk prescribers" by "benchmarking" prescription data based on "several parameters," including "volume of prescriptions for high-risk drugs," "the proportion of the prescriber's prescriptions that were for such [high-risk] drugs, as compared with the volume and proportion for others in the same specialty and region," cash payment, ages of patients, and the prescriber's ratio of "prescriptions for noncontrolled substances with prescriptions for controlled substances." *Id.* This "[a]nalysis of aggregated data" from chain pharmacies can "target patterns of abuse," in the face of "the growing use of controlled substances and resulting illnesses and deaths." *Id.*

71.     Specifically, Walmart had a duty to analyze data and store-level information for known red flags such as (a) multiple prescriptions to the same patient using the same doctor; (b) multiple prescriptions by the same patient using different doctors; (c) prescriptions of unusual size and frequency for the same patient; (d) orders from out-of-state patients or prescribers; (e) an unusual or disproportionate number of prescriptions paid for in cash; (f) prescriptions paired with other drugs frequently abused with opioids, like benzodiazepines, or prescription "cocktails"; (g) volumes, doses, or combinations that suggested that the prescriptions were likely being diverted

22

or were not issued for a legitimate medical purpose. Walmart had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level.

72. Walmart may not ignore red flags of illegal conduct and must use the information available to it to identify, report, and not fill prescriptions that are indicative of diversion. That would include reviewing its own data, relying on its observations of prescribers, pharmacies, and customers, and following up on reports or concerns of potential diversion. All suspicious prescriptions and orders must be reported to relevant enforcement authorities.

73. Further, Walmart must not fill or ship any suspicious prescription or order unless it has conducted an adequate investigation and determined that the prescription or order is not likely to be diverted into illegal channels.[39] As a distributor and a pharmacy, Walmart has a duty to be vigilant, and is expected to be vigilant, in ensuring that controlled substances are delivered only for lawful purposes.

74. Together, these laws and industry guidelines make clear that Walmart possesses and is expected to possess, specialized and sophisticated knowledge, skill, information, and understanding of both the market for scheduled prescription opioids and of the risks and dangers of the diversion of prescription opioids when the supply chain is not properly controlled.

75. Reasonably prudent distributors and pharmacies would not fall below this standard of care, as their failure to exercise appropriate controls foreseeably harms the public health and welfare.

---

[39] *See Southwood Pharm., Inc.*, 72 Fed. Reg. 36,487, 36,501 (Drug Enf't Admin. July 3, 2007) (applying federal requirements no less stringent than those of Ohio); *Masters Pharmaceutical, Inc. v. Drug Enforcement Administration*, 861 F.3d 206 (D.C. Cir. 2017) (same).

23

### 3. Walmart was Aware of and Has Acknowledged Its Obligations to Prevent Diversion and to Report and Take Steps to Halt Suspicious Orders.

76.     The CSA and its implementing regulations aim to create a "closed" system in order to control the supply and reduce the diversion of these dangerous drugs out of legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control. Both because distributors handle such large volumes of controlled substances, and because they are uniquely positioned, based on their knowledge of their customers and orders, as the first line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market, distributors' obligation to maintain effective controls to prevent diversion of controlled substances is critical. Should a distributor deviate from these checks and balances, the closed system of distribution, designed to prevent diversion, collapses.

77.     Walmart, as a distributor and a pharmacy, was well aware it had an important role to play in this system, and also knew or should have known that its failure to comply with its obligations would have serious consequences.

78.     Indeed, the DEA has repeatedly informed Walmart about its legal obligations, including obligations that were so obvious that they simply should not have required additional clarification. As former DEA agent Joseph Rannazzisi recently explained during a deposition in the MDL:

> Q. Someone says "Don't steal," do you have to put in there "from a supermarket"?
>
> A. No.
>
> Q. Someone says "Don't trespass on the property," do you have to put "wearing tennis shoes"?
>
> A. No.

24

.

Q. Next, you got asked: "Well, you never instructed the companies to keep their files." Do you remember that?

A. Yes, sir.

Q. Would old files be important in monitoring -- in your ongoing monitoring? Would it be important that a company keep their files so that they can look back at them?

A: Absolutely. That's the -- the whole idea behind maintaining a due diligence file is you have a history of purchases. That way you could see what they're doing and where they're going with their purchases.[40]

79.     Likewise, it is not an effective control against diversion to identify a suspicious

order, ship it, and wait as long as weeks to report it to law enforcement, potentially allowing those

pills to be diverted and abused in the meantime.

80.     During a 30(b)(6) deposition in the MDL, the DEA's Unit Chief of Liaison was

asked whether the DEA made it "clear to industry that the failure to prevent diversion was a threat

to public safety and the public interest." In response, he testified:

> Yes, I think it's established in 823 [the Controlled Substances Act] where it's part of our -- part of the registrant that is applying to be a registrant understands that they have to maintain effective controls . . . . they also know that these drugs themselves are scheduled controlled substances for a particular reason, because they're addictive, psychologically and physically they're addictive, so they know that these drugs have these properties within themselves. **So they would understand that these drugs are categorized or scheduled in that manner because they have the potential to hurt.**[41]

81.     The DEA also repeatedly reminded Walmart of its obligations to report and decline

to fill suspicious orders. Responding to the proliferation of internet pharmacies that arranged illicit

---

[40] Rannazzisi Dep. at 646:20-647:19.
[41] Prevoznik Dep. Vol III at 942:3-8; 942:11-943:3 (emphasis added).

sales of enormous volumes of opioids, the DEA began a major push to remind distributors of their obligations to prevent these kinds of abuses and educate them on how to meet these obligations.

82.     Specifically, in August 2005, the DEA's Office of Diversion Control launched the "Distributor Initiative." The Distributor Initiative did not impose any new duties on distributors, but simply reminded them of their duties under existing law. The stated purpose of the program was to "[e]ducate and inform distributors/manufacturers of their due diligence responsibilities under the CSA by discussing their Suspicious Order Monitoring System, reviewing their [Automation of Reports and Consolidated Orders System ("ARCOS")] data for sales and purchases of Schedules II and III controlled substances, and discussing national trends involving the abuse of prescription controlled substances."[42] The CSA requires that distributors (and manufacturers) report all transactions involving controlled substances to the United States Attorney General. This data is captured in ARCOS, the "automated, comprehensive drug reporting system which monitors the flow of DEA controlled substances from their point of manufacture through commercial distribution channels to point of sale or distribution at the dispensing/retail level—hospitals, retail pharmacies, practitioners, mid-level practitioners, and teaching institutions."[43]

83.     The DEA has hosted many different conferences throughout the years, including Pharmacy Diversion Awareness Conferences, to provide registrants with updated information about diversion trends and their regulatory obligations. The DEA also frequently presented at various other conferences for registrants at the national, state, or local level.

---

[42] Thomas W. Prevoznik, Office of Diversion Control, Distributor Initiative presentation (Oct. 22, 2013), https://www.deadiversion.usdoj.gov/mtgs/distributor/conf_2013/prevoznik.pdf.
[43] U.S. Dept. of Justice, Drug Diversion Administration, Diversion Control Division website, https://www.deadiversion.usdoj.gov/arcos/index.html.

84.     Through presentations at industry conferences and on its website, the DEA provided detailed guidance to distributors on what to look for in assessing their customers' trustworthiness. As an example, the DEA published "Suggested Questions a Distributor Should Ask Prior to Shipping Controlled Substances."[44]

85.     In addition, the DEA sent a series of letters, beginning on September 27, 2006, to every commercial entity registered to distribute controlled substances, including chain pharmacy distributors. The 2006 letter emphasized that distributors are:

> one of the key components of the distribution chain. If the closed system is to function properly . . . distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes. This responsibility is critical, as . . . the illegal distribution of controlled substances has a substantial and detrimental effect on the health and general welfare of the American people.[45]

86.     The letter also warned that "even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm."[46]

87.     The DEA sent a second letter to distributors on December 27, 2007. Again, the letter instructed that, as registered distributors of controlled substances, they must each abide by statutory and regulatory duties to "maintain effective controls against diversion" and "design and

---

[44] U.S. Dept. of Justice DEA, Diversion Control Division website, Pharmaceutical Industry Conference (Oct 14 & 15, 2009), *Suggested Questions a Distributor should ask prior to shipping controlled substances,* Drug Enforcement Administration *available at* https://www.deadiversion.usdoj.gov/mtgs/pharm_industry/14th_pharm/levinl_ques.pdf; Richard Widup, Jr., Kathleen H. Dooley, Esq., *Pharmaceutical Production Diversion: Beyond the PDMA,* Purdue Pharma and McGuireWoods LLC, *available at* https://www.mcguirewoods.com/news-resources/publications/lifesciences/product_diversion_beyond_pdma.pdf.

[45] Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Off. of Diversion Control, Drug Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Sept. 27, 2006), filed in *Cardinal Health, Inc. Inc. v. Holder*, No. 1:12-cv-00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-51 ("2006 Rannazzisi Letter"); *see also* CVS-MDLT1000091513; WAGMDL00757797.

[46] *Id.*

operate a system to disclose to the registrant suspicious orders of controlled substances."[47] DEA's letter reiterated the obligation to detect, report, and not fill suspicious orders and provided detailed guidance on what constitutes a suspicious order and how to report (*e.g.*, by specifically identifying an order as suspicious, not merely transmitting ARCOS data to the DEA).

88.     The DEA's regulatory actions against the three largest wholesale distributors further underscore the fact that distributors such as Walmart were well aware of their legal obligations. There is a long history of enforcement actions against registrants for their compliance failures. For example, in 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against three of Cardinal Health's distribution centers and on December 23, 2016, Cardinal Health agreed to pay the United States $44 million to resolve allegations that it violated the CSA in Maryland, Florida, and New York. Similarly, on May 2, 2008, McKesson entered into an Administrative Memorandum of Agreement ("AMA") with the DEA related to its failures in maintaining an adequate compliance program. Subsequently, in January 2017, McKesson entered into an AMA with the DEA wherein it agreed to pay a $150 million civil penalty for, *inter alia*, failure to identify and report suspicious orders at several of its facilities.

89.     The DEA has also repeatedly affirmed the obligations of pharmacies to maintain effective controls against diversion in regulatory action after regulatory action.[48] The DEA, among

---

[47] Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug. Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Dec. 27, 2007), filed in Cardinal Health, Inc. v. Holder, No. 1:12-cv00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-8 ("2007 Rannazzisi Letter").

[48] *See, e.g.*, Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195; 77 Fed. Reg. 62,316 (DEA Oct. 12, 2012) (decision and order); East Main Street Pharmacy, 75 Fed. Reg. 66,149 (DEAOct. 27, 2010) (affirmance of suspension order); Holiday CVS, L.L.C. v. Holder, 839 F.Supp.2d 145 (D.D.C. 2012); Townwood Pharmacy; 63 Fed. Reg. 8,477 (DEA Feb. 19, 1998) (revocation of registration); Grider Drug 1 & Grider Drug 2; 77 Fed. Reg. 44,069 (DEA July 26, 2012) (decision and order); The Medicine Dropper; 76 Fed. Reg. 20,039 (DEA April 11, 2011) (revocation of registration); Medicine Shoppe-Jonesborough; 73 Fed. Reg. 363 (DEA Jan. 2, 2008) (revocation of registration).

others, has provided extensive guidance to pharmacies on how to identify suspicious orders and other evidence of diversion.

90.    DEA has repeatedly emphasized that retail pharmacies, such as Walmart, are required to implement systems that detect and prevent diversion and must monitor for and report red flags of diversion.  When red flags appear, the pharmacy's "corresponding responsibility" under 21 C.F.R. § 1306.04(a) requires it either to take steps (and document those steps) to resolve the issues or else to refuse to fill prescriptions with unresolvable red flags.[49] DEA has identified several types of "unresolvable red flags" which, when present in prescriptions presented to a pharmacist, may never be filled by the overseeing pharmacist. These unresolvable red flags include: a prescription issued by a practitioner lacking valid licensure or registration to prescribe the controlled substances; multiple prescriptions presented by the same practitioner to patients from the same address, prescribing the same controlled substances in each presented prescription; a high volume of patients presenting prescriptions and paying with cash; and, a prescription presented to by a customer who has traveled significant and unreasonable distances from their home to see a doctor and/or to fill the prescription at the pharmacy.

91.    DEA guidance also instructs pharmacies to monitor for red flags that include: (1) prescriptions written by a doctor who writes significantly more prescriptions (or in larger quantities or higher doses) for controlled substances as compared to other practitioners in the area, and (2) prescriptions for antagonistic drugs, such as depressants and stimulants, at the same time. Most of the time, these attributes are not difficult to detect and should be easily recognizable by Walmart's diversion control systems.

---

[49] *Pharmacy Doctors Enterprises, Inc. v. Drug Enf't Admin.*, No. 18-11168, 2019 WL 4565481, at *5 (11th Cir. Sept. 20, 2019).

### 4. **Walmart is Uniquely Positioned to Guard Against Diversion.**

92.      Not only does Walmart often have firsthand knowledge of dispensing red flags –
such as distant geographic location of doctors from the pharmacy or customer, lines of seemingly
healthy patients, cash transactions, and other significant information – but it also has the ability to
analyze data relating to drug utilization and prescribing patterns across multiple retail stores.  As
with other distributors, these data points give Walmart insight into prescribing and dispensing
conduct that enables it to prevent diversion and fulfil its obligations under the CSA.

93.      Walmart had complete access to all prescription opioid dispensing data related to
its pharmacies in the Counties, complete access to information revealing the doctors who
prescribed the opioids dispensed in its pharmacies in and around the Counties, and complete access
to information revealing the customers who filled or sought to fill prescriptions for opioids in its
pharmacies in and around the Counties. Further, Walmart had complete access to information
revealing the geographic location of out-of-state doctors whose prescriptions for opioids were
being filled by its pharmacies in and around the Counties and complete access to information
revealing the size and frequency of prescriptions written by specific doctors across its pharmacies
in and around the Counties.

94.      Walmart, until March 2020, resisted producing its dispensing data in the MDL, and
now seeks to claw it back. Thus, while Walmart had access to data that would have demonstrated
its knowledge of red flags and potential diversion, the Counties have not been able to access that
data to fully analyze both what Walmart knew, or should have known, and the impact that it could
have had in preventing diversion in the Counties.

### 5. **Walmart Failed to Maintain Effective Controls Against Diversion.**

95.      Walmart is the largest private employer in the United States by far.  It employs
more than 1.5 million people.  But for years, Walmart chose not to assign a single employee to

design or operate a system to detect suspicious orders of controlled substances. Walmart chose to do nothing while hundreds of thousands of people were dying, and waited until 2014 to begin to take meaningful action. By that time, it was too late.

> a. *Walmart Lacked a Suspicious Order Monitoring System for Most of the Relevant Time-Period.*

96.     Walmart self-distributed opioids to its retail stores. Specifically, Walmart operated registered distribution centers to supply its own pharmacies with controlled substances from the early 2000s until 2018 when it ceased self-distributing controlled substances. Walmart's conduct is particularly troubling given that it acted both as a self-distributing and dispensing pharmacy for such a long period of time.

97.     Prior to 2011, Walmart had not designed any formal system to identify suspicious orders of controlled substances and, therefore, utterly failed to meet its statutory obligations.

98.     Walmart has claimed that its hourly employees and associates—who were also responsible for filling orders at Walmart Distribution Centers—monitored the orders they were filling for unusual size, pattern, and frequency. Typically, this "review" involved between 700 and 800 orders a day. Walmart has also claimed that these hourly associates were instructed to alert a supervisor if an order appeared unusual based on their experience and memory.

99.     Upon information and belief, Walmart can produce no written evidence of any such instructions to Walmart associates, no evidence of any training that would be required to implement such a procedure, or anyone actually being alerted about an unusual order or performing any follow up inquiry.

100.    Walmart failed to provide any guidance to the associates as to what constitutes a "suspicious" order. Instead, Walmart emphasized its associates' subjective judgment based on

their "knowledge and experience" as distribution center employees. There is no evidence that any Walmart employee ever flagged an order as suspicious prior to 2011.

101. Walmart purportedly implemented a "monitoring program" that would identify suspicious orders of controlled substances in 2011. This system purportedly was in place until 2015.

102. Walmart's monitoring program was insufficient to identify suspicious orders of controlled substances. The program flagged only very large orders of controlled substances. Specifically, it flagged weekly orders for controlled substances of 50 bottles (5,000 dosage units) or more and orders of more than 20 bottles (2,000 dosage units) that were 30% higher than a rolling four-week average for that item. Orders under 2,000 dosage units per week were never flagged, meaning that a pharmacy could order 8,000 dosage units per month without ever being flagged. Moreover, that meant that even if an order was more than 30% greater than the four-week average, it could not draw an alert unless it also was more than 20 bottles.

103. Under this system, an alert did not mean Walmart would report the order or halt it pending necessary due diligence. To the contrary, upon information and belief, Walmart *never* reported an order flagged by its monitoring program to the DEA as suspicious. In addition, rather than halting the order, Walmart simply cut the order to the amount of the 50 bottles threshold and shipped it. Walmart never reported cut orders to the DEA. Although information regarding flagged orders was available and sent daily to Walmart's headquarters in Arkansas (the "Home Office"), no one from the Home Office ever reviewed or took *any action* regarding flagged orders.

104. This practice continued until mid-2012, when Walmart implemented "hard limits" on opioid orders. Under this approach, weekly orders of Oxycodone 30mg ("Oxy 30") were automatically reduced to 20 bottles. Still, Walmart failed to report the orders to the DEA.

32

105.    During this time period, Walmart also monitored weekly orders of other controlled substances in quantities of more than 20 bottles. Specifically, an "Over 20 Report" was provided to the Home Office in the morning and if nothing was done by mid-afternoon, the orders were filled and shipped. Upon information and belief, there is no evidence of any order in fact being held or reviewed pursuant to this practice.

106.    Further, cutting the order did not mean that Walmart pharmacy would not receive the full supply. Walmart pharmacies also purchased opioids from outside suppliers, including McKesson and AmerisourceBergen. Pharmacies could place another order with these outside vendors to make up the difference, or in some cases, have orders fulfilled by both Walmart and a third-party distributor at the same time. Thus, even though Walmart had the ability to monitor such orders, it chose not to, which allowed its pharmacies to surpass its already high thresholds by simply ordering drugs from a third party.

107.    Walmart knew that its monitoring program was insufficient to fulfill its obligations to prevent diversion. For example, in 2013, Walmart acknowledged in an internal presentation that it had not yet designed a compliant system for suspicious order identification, monitoring, and reporting. It also stated that it was "TBD" when Walmart would develop such a system. In June 2014, Walmart again acknowledged that it lacked a compliant monitoring program. Moreover, Walmart acknowledged in 2014 that it had "no process in place" to comply with government regulations and that this created the "severe" risk of "financial or reputational impact to the company."

108.    It was not until late 2014 that Walmart's written policies and procedures required orders of interest to be held and investigated.

> b.  *Walmart's "Enhanced" Monitoring Program Fails to Remedy Deficiencies in its Monitoring Program.*

33

109.     In 2015, Walmart enhanced its suspicious order monitoring policy by implementing store-specific thresholds. Upon information and belief, it based these thresholds on the standard deviation of a specific pharmacy's order history for each controlled substance. The thresholds also included minimum amounts, below which no orders were flagged under any circumstance, regardless of pattern or frequency.

110.     Walmart's corporate designee, testifying on its behalf in the MDL, conceded that thresholds were set for business purposes, not for the purpose of "main[taining] of effective controls against diversion . . . into other than legitimate . . . channels . . . ." 21 U.S.C.A. § 823(a)(1), (b)(1). Further, for almost all Walmart pharmacies, this minimum was set at 2,000 dosage units per week (or 8,000 dosage units per month). Accordingly, even when Walmart implemented a store specific policy that took into consideration a pharmacy's order history, the program was still woefully deficient because it did not account for changes in ordering patterns. A pharmacy could, for example, go from ordering 10 dosage units of Oxycodone 10 mg per month to 7,999 per month without any order being flagged or reviewed.

111.     With respect to Walmart's suspicious order monitoring system for its wholesale distribution, the MDL Court has denied a motion for summary judgment contesting the evidence regarding the inadequacy of Walmart's suspicious order monitoring efforts in that litigation. *See* Opinion and Order Denying Walmart's Motion for Summary Judgment, MDL No. 2804, ("MDL") Doc. 3102 (N.D. Ohio Jan. 27, 2020). In doing so, it "noted[d] the record evidence suggests obvious deficiencies that a layperson could plainly recognize." *Id.* at 4 n. 12.

> c.     *Walmart Failed to Guard Against Diversion in Distributing into Pulaski and Jefferson Counties.*

112.     According to data from the ARCOS database, between 2006 and 2014, Walmart shipped 242,875,451 dosage units of opioids to Arkansas stores and Walmart stores in Arkansas

34

purchased 249,220,464 dosage units of opioids in Arkansas, making it the largest purchaser of opioids in the State.

113.    Walmart funneled far more opioids into Arkansas and the Counties than could have been used for legitimate medical purposes, and ignored other red flags of suspicious orders. This information, along with the information known only to distributors such as Walmart (especially with its pharmacy dispensing data), would have alerted Walmart to potential diversion of opioids.

114.    In addition, Walmart, upon information and belief, distributed and dispensed substantial quantities of prescription opioids in other states, and these drugs were diverted from these other states to Arkansas. Walmart failed to take meaningful action to stop this diversion despite its knowledge of it, and it contributed substantially to the opioid epidemic in Arkansas.

115.    In the Counties, Walmart violated the standard of care for a distributor by failing to:  (a) control the supply chain; (b) prevent diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities it knew or should have known could not be justified and signaled potential diversion.

116.    Upon information and belief, for years, per capita opioid prescriptions in the Counties far exceeded the national average and increased in ways that should have alerted Walmart to potential diversion. Indeed, as a formerly vertically integrated, national retail pharmacy chain, Walmart had the ability to detect diversion in ways third-party wholesale distributors could not by examining the dispensing data from its own retail pharmacy locations.

117.    Given the volume and pattern of opioids distributed in Arkansas and in the Counties, Walmart was, or should have been aware that opioids were being oversupplied into the state and should have detected, reported, and rejected suspicious orders. Yet, the information available shows it did not.

118.     Upon information and belief, Walmart by virtue of the data available to it, was actually aware of indicia of diversion, such as (1) individuals traveling long distances to fill prescriptions; (2) prescriptions for drug "cocktails" known for their abuse potential, such as oxycodone and Xanax; (3) individuals who arrived together with identical or nearly identical prescriptions; (4) high percentage of cash purchases; and (5) doctors prescribing outside the scope of their usual practice or geographic area. However, Walmart ignored these obvious red flags.

119.     Walmart therefore, was aware of the suspicious orders that flowed from its distribution facilities. Walmart refused to identify, investigate, and report suspicious orders despite its actual knowledge of drug diversion. Rather, Walmart failed to report suspicious orders, prevent diversion, or otherwise control the supply of opioids flowing into Arkansas and the Counties.

120.     Upon information and belief, Walmart failed to analyze: (a) the number of opioid prescriptions filled by its pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; and (c) the number of opioid prescriptions filled relative to other drugs.

121.     Walmart was, or should have been, fully aware that the opioids being distributed and dispensed by it were likely to be diverted; yet, it did not take meaningful action to investigate or to ensure that it was complying with its duties and obligations with regard to controlled substances, including its responsibility to report suspicious orders and prescriptions and not to ship or fill such orders and prescriptions unless and until due diligence allayed the suspicion.

122.     Given Walmart's retail pharmacy operations, in addition to its role as a wholesale distributor, Walmart knew or reasonably should have known about the disproportionate flow of opioids into Arkansas and the Counties and the operation of "pill mills" that generated opioid

prescriptions that, by their quantity or nature, were red flags for, if not direct evidence of, illicit supply and diversion.

> d. *Walmart Failed to Maintain Effective Controls Against Diversion from its Pulaski and Jefferson Counties Pharmacies.*

123.    Walmart, throughout the relevant time period, owned and operated pharmacies throughout the United States, including pharmacies in at least 8 stores in Pulaski County and one store in Jefferson County.  Through its wholly owned or controlled subsidiary companies, Walmart operates over 4,500 retail pharmacies across the U.S., a mail-order pharmacy, a specialty pharmacy, and six pharmacy distribution centers that distribute to other Walmart entities.

124.    Walmart set policies for its pharmacies at the corporate level. Walmart also presented, through nationwide advertising, a public image of the safety and excellence of all the pharmacists the company hired.  In a recruitment video for pharmacists on Walmart's YouTube channel, the company shows Walmart pharmacists speaking about working at the company: "the safety and the excellence we carry to our patients is phenomenal," adding that "the culture that our company has [is] respect for the individual, service, and excellence, and, of course, we always have integrity."[50]  The commercial also states that Walmart's pharmacists "strive for excellence" and are "passionate about providing quality healthcare."[51]

125.    Walmart's policies enabled its pharmacies in and around Pulaski and Jefferson Counties to receive distributions of prescriptions from Walmart's distribution centers and from other wholesale distributors. As a result, these pharmacies were able to have the same orders filled by both Walmart and a third-party distributor.

---

[50]    Walmart, *Your Career as a Walmart Pharmacist* (Sept. 25, 2014), available at https://www.youtube.com/watch?v=9VD12JXOzfs (last visited May 13, 2020).
[51] *Id.*

126. Upon information and belief, the volume of prescription opioids dispensed by Walmart pharmacies in and around Pulaski and Jefferson Counties was indicative of potential diversion and required appropriate due diligence.

127. As a vertically integrated distributor and dispenser of prescription opioids, Walmart had unique insight into all distribution and dispensing level data, and knew or should have known that it was distributing and dispensing an excessive volume of pills in and around the Counties.

128. Yet, Walmart failed to put in place effective policies and procedures for the dispensing of prescription opioids and failed to provide adequate guidance to its pharmacists on dispensing opioids. Moreover, Walmart's pressure on pharmacists to fill more prescriptions quickly was at odds with a culture and practice of compliance. Incentive awards were tied to the number of prescriptions a pharmacy filled and profit that the pharmacy generated. Upon information and belief, controlled substances were included in Walmart's pharmacy incentive program for most of the relevant time-period. In addition, pharmacists were under constant pressure to increase the number of prescriptions they filled, and to increase the overall percentage of pharmacy sales. As a result, upon information and belief, because of Walmart's drive for speed, pharmacists often did not have enough time to sufficiently review a prescription and conduct the appropriate due diligence.

129. Even when Walmart pharmacists suspected diversion based on an individual prescriber's prescribing practices, for years, Walmart did not give its pharmacists discretion to independently employ blanket refusals to fill prescriptions from that prescriber. Finally, in 2017, Walmart implemented a policy by which individual pharmacists could request such blanket refusals from its national compliance office which, if granted, would permit the pharmacist to refuse to fill future prescriptions from that prescriber without evaluating each prescription

38

individually. Notably, Walmart always had the ability to "centrally block" problematic prescribers

across all Walmart and Sam's Club pharmacies, but it did not establish a procedure to do so until

2017. In the "Practice Compliance" document describing this policy, Walmart admitted that it

may, "in certain situations," have information about prescribing practices that is not available to

individual pharmacists:

> While pharmacists are in the best position to determine whether
> individual prescriptions are appropriate, *additional information may*
> *be obtained that is not available to our pharmacists.* Therefore, in
> certain situations, a prescriber may be identified whose prescribing
> practices raise concerns about prescribing controlled substances for
> legitimate medical purposes. After a thorough review, these
> additional insights may lead Walmart to place a block in Connexus
> on controlled substance prescriptions from these prescribers.

130.    These systemic issues are reflected in numerous enforcement actions and

investigations that demonstrate that Walmart put profits and sales ahead of compliance, its

customers and communities, and public safety. In 2009, for example, the DEA issued a Show

Cause order seeking to revoke the registration of a Walmart pharmacy in California. The order

alleged that the pharmacy:

> (1) improperly dispensed controlled substances to individuals based on
> purported prescriptions issued by physicians who were not licensed to
> practice medicine in California; (2) dispensed controlled substances . . .
> based on Internet prescriptions issued by physicians for other than a
> legitimate medical purpose and/or outside the usual course of professional
> practice . . . ; and (3) dispensed controlled substances to individuals that [the
> pharmacy] knew or should have known were diverting the controlled
> substances.

131.    In addition, a 2011 Memorandum of Agreement ("2011 MOA") arising out of the

investigation states that the DEA also learned that the same pharmacy was allegedly dispensing

controlled substances based on prescriptions that lacked valid DEA numbers and allegedly refilling

controlled-substances prescriptions too early.

132. Upon information and belief, the failures described in the 2011 MOA were not limited to California but reflected systemic failures at the corporate level. Indeed, the 2011 MOA, which required Walmart to maintain a "compliance program" states that it is applicable to "all current and future Walmart Pharmacy locations."

133. Following the 2011 MOA, Walmart was supposed to revamp its dispensing compliance program. Instead, systemic failures continued, and Walmart's national corporate office not only failed to insist that Walmart implement adequate controls against diversion, they ignored concerns raised by Walmart pharmacists.

134. One internal document from 2015, for example, notes concerns from a Walmart pharmacist that "his leadership would not support his refusing to fill any 'legitimate' (written by a Dr) prescriptions and he stated that his current volume/staffing structure doesn't allow time for individual evaluation of prescriptions[.]" When this pharmacist refused to fill a customer's controlled substance prescription because the customer was attempting to fill it too soon, the Market Health & Wellness Director for that store complained to management that the pharmacist "sent a customer to a competitor" and "expressed significant concern about how 'sending customers away' would impact the sales figures for the store," and insisted that "the store needs to fill every available prescription."

135. In October 2018, the U.S. Department of Justice ("DOJ") had evidence that Walmart pharmacies in Texas (using the same pharmacy management systems as in Arkansas) dispensed opioids that killed customers who overdosed on the drugs. "The pharmacists who dispensed those opioids had told the company they didn't want to fill the prescriptions because they were coming from doctors who were running pill mills," but their pleas "for help and guidance

from Walmart's corporate office" in Arkansas fell on deaf ears.[52] Pharmacists in a number of other states also sought help from Walmart's corporate office in Arkansas, also to no avail.   Walmart compliance officials failed to take action in response to these alarms. "Instead, they repeatedly admonished pharmacists that they could not cut off any doctor entirely."[53]   Even if pharmacists believed the doctor was operating a pill mill, rather than providing genuine medical care, "[t]hey could only evaluate each prescription on an individual basis."[54]   In fact, a 2011 document from Walmart Regulatory Affairs regarding the "Proper Prescriber-Patient Relationship" stated, "Blanket refusals of prescriptions are not allowed. A pharmacist must make an individual assessment of each prescription and determine that it was not issued based on a valid prescriber-patient relationship or a valid medical reason before refusing to fill."

136.    A Texas federal prosecutor, in connection with an investigation that began in 2016, described a systemic problem. The investigation showed Walmart's issue was not a few rogue employees. Rather, "Walmart had a national problem."[55] The investigation reportedly revealed that between 2011 and 2017, "Walmart pharmacists repeatedly filled prescriptions that they worried were not for legitimate medical purposes, including large doses of opioids and mixtures of drugs the DEA considered red flags for abuse.[56]  They did so even though Walmart pharmacists in Texas, Maine, North Carolina, Massachusetts, Kansas, and Washington all "raised alarms to the company's national compliance department about doctors."[57] Regarding one Texas doctor who was later convicted of illegal distribution of opioids, a Walmart pharmacist wrote; *"We are all*

---

[52] Jesse Eisinger and James Bandler, *Walmart Was Almost Charged Criminally Over Opioids. Trump Appointees Killed the Indictment.*, ProPublica, (March 25, 2020), https://www.propublica.org/article/walmart-was-almost-charged-criminally-over-opioids-trump-appointees-killed-the-indictment
[53] *Id.*
[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] *Id.*

*concerned about our jobs and about filling for a pill mill doctor. . . Please help us."*[58] Another described the same doctor as a "problem," a "liability for us," and a "risk that keeps [him] up at night," cautioning "[t]his is a serious situation."[59] Similarly, in September 2016, a Walmart pharmacist in Pennsylvania advised that a doctor was "under investigation by the DEA for what we believe is a pill mill operation," and that Rite Aid had begun refusing to fill his prescriptions, prompting prescriptions from this prescriber, which were *"almost solely narcotic and controlled prescriptions"* to double.[60] Still, Walmart adhered to its policy of requiring a case-by-case analysis of each prescription from the suspected pill mill placed with any Walmart pharmacy; it would not block the prescriber in its system or allow a "blanket" refusal to fill.  Walmart was more concerned with the potential sale than it was with preventing diversion.

137.    Upon information and belief, Walmart also failed to adequately use data available to it to identify doctors in and around the Counties who were writing suspicious numbers of prescriptions and/or prescriptions of suspicious amounts or doses of opioids, or to adequately use data available to it to prevent the filling of prescriptions that were illegally diverted or otherwise contributed to the opioid crisis.

**D.    Walmart Performance Metrics Put Profits Before Safety.**

138.    Upon information and belief, not only did Walmart lack (and fail to implement) adequate policies and procedures to guard against diversion, but compounded this problem by implementing performance metrics and prescription quotas for retail stores that contributed to a black market, including in the Counties.

---

[58] *Id.*
[59] *Id.*
[60] *Id.*

139. This pressure and focus on profits would not only lead to mistakes, it also would necessarily deter pharmacists from carrying out their obligations to report and decline to fill suspicious prescriptions and to exercise due care in ascertaining whether a prescription is legitimate.

140. Indeed, "a survey by the Institute for Safe Medication Practices (ISMP) revealed that 83% of the pharmacists surveyed believed that distractions due to performance metrics or measured wait times contributed to dispensing errors, as well as that 49% felt specific time measurements were a significant contributing factor."[61]

141. In 2013, the National Association of Boards of Pharmacy (NABP), passed a resolution which cited this survey and additionally stated that "performance metrics, which measure the speed and efficiency of prescription work flow by such parameters as prescription wait times, percentage of prescriptions filled within a specified time period, number of prescriptions verified, and number of immunizations given per pharmacist shift, may distract pharmacists and impair professional judgment" and "the practice of applying performance metrics or quotas to pharmacists in the practice of pharmacy may cause distractions that could potentially decrease pharmacists' ability to perform drug utilization review, interact with patients, and maintain attention to detail, which could ultimately lead to unsafe conditions in the pharmacy."[62]

142. Still, according to a 2016 investigation by the *Chicago Tribune*, as chain pharmacies increasingly promote quick service, "pharmacists frequently race through legally required drug safety reviews — or skip them altogether," missing dangerous drug combinations in

---

[61] NAPB, Performance Metrics and Quotas in the Practice of Pharmacy (Resolution 109-7-13) (June 5, 2013), https://nabp.pharmacy/performance-metrics-and-quotas-in-the-practice-of-pharmacy-resolution-109-7-13/.
[62] *Id.*

43

the process.[63] A pharmacist too rushed to check for a potentially deadly drug interaction is also likely to be too rushed to check for red flags of diversion, such as prescription "cocktails" or other combinations of highly abused drugs.

143.    According to the *Tribune's* coverage, "Wal-Mart, operator of 4,500 U.S. pharmacies, failed 43 percent of its tests."[64]   Further, a Walmart pharmacist commented that she typically filled 200 prescriptions in her daily nine-hour shift, and an even higher volume when working at a different store, equating to two prescriptions per minute.[65]

144.    In reporting on the results of its investigation, the *Tribune* quoted Bob Stout, president of the New Hampshire Board of Pharmacy, stating that "'They're cutting corners where they think they can cut."[66]   As the report itself explained: "some pharmacies emphasize fast service over patient safety. Several chain pharmacists, in interviews, described assembly-line conditions in which staff hurried to fill hundreds of prescriptions a day.[67]

145.    More recently, a January 2020 *New York Times* article, referenced above, revealed that the problematic performance metrics remain, and have remained, in place. One South Carolina pharmacist advised:

> We are being asked to do things that we know at a gut level are dangerous. If we won't or can't do them, our employers will find someone else who will, and they will likely try to pay them less for the same work.

146.    In March 2020, journalists also revealed that Walmart not only ignored reports of suspicious activity from pharmacists concerned that they were filling prescriptions for pill mills, but the company considered these pharmacists' focus misdirected. One internal email, reviewed

---

[63]    Sam Roe, Ray Long, and Karisa King, Contract Reporters, *Pharmacies Miss Half of Dangerous Drug Combinations*, Dec. 15, 2016, http://www.chicagotribune.com/news/watchdog/druginteractions/ct-drug-interactions-pharmacy-met-20161214-story.html.
[64]    *Id.*
[65]    *Id.*
[66]    *Id.*
[67]    *Id.*

by ProPublica, showed that in response to a question from a regional manager in 2015 about documenting pharmacists' concerns about doctors believed to be operating pill mills, Walmart's director of Health and Wellness Practice Compliance, Brad Nelson, wrote, "We have not invested a great amount of effort in doing analysis on the data since the agreement [requiring such reporting] is virtually over. *Driving sales and patient awareness is a far better use of our Market Directors and Market Manager's time.*"[68]

147.    As described above, Walmart implemented nationwide policies and procedures and refused to allow pharmacies to flag and block all prescriptions from doctors whose prescriptions raised red flags that they were running pill mills. Not only did pharmacists have to refuse each prescription individually, to do so, "a pharmacist had to fill out a form that could take 20 minutes, a bureaucratic hurdle that pharmacists sought to avoid because they were under pressure to fill prescriptions quickly." [69]

**E.      Walmart Fraudulently Concealed Its Misconduct**

148.    Walmart fraudulently concealed its misconduct. As discussed earlier, it resisted producing its dispensing data in the MDL, and now seeks to claw it back. In addition, Walmart publicly portrays itself as maintaining sophisticated technology as part of a concerted effort to thwart diversion and publicly portrays itself as being committed to fighting the opioid epidemic. However, its public pronouncements are at odds with its concealed misconduct.

149.    Walmart was deliberate in taking intentional steps to conceal its active role in the oversupply of opioids and its failure to prevent the entry of prescription drugs into illicit markets, which fueled the opioid epidemic.

---

[68] Jesse Eisinger and James Bandler, *Walmart Was Almost Charged Criminally Over Opioids. Trump Appointees Killed the Indictment.*, ProPublica, (March 25, 2020), https://www.propublica.org/article/walmart-was-almost-charged-criminally-over-opioids-trump-appointees-killed-the-indictment
[69] *Id.*

150.    The Counties did not discover the nature, scope, and magnitude of Walmart's misconduct, and its full impact on the Counties, until recently, and the Counties could not have acquired such knowledge earlier through the exercise of reasonable diligence.

## F.    By Ignoring Mandatory Obligations To Report Suspicious Orders And Guard Against Diversion, Walmart Fueled The Opioid Epidemic And Significantly Harmed The Counties And Their Residents

151.    Walmart compounded the harms from aggressive marketing that overcame barriers to widespread prescribing of opioids for chronic pain by supplying opioids beyond even what this expanded market could bear, and by turning a blind eye to red flags that it was fueling abuse and diversion of these dangerous drugs.

152.    By continuing to fill opioid prescriptions without effective policies in place to guard against diversion, and by failing to have in place an effective suspicious order monitoring system, Walmart supplied opioids that it knew or should have known would be used for other than legitimate medical use, would be abused by patients who had become addicted, or would be diverted to non-patients. Walmart also knew or should have known that by failing to report, and failing to exercise due diligence not to fill suspicious orders, it would facilitate access to opioids for patients who could no longer access or afford prescription opioids, and for addicts struggling with relapse.

153.    In 2018, nearly half of 444 reported deaths involving drug use in Arkansas involved opioids.    In 2016, Pulaski County alone experienced 156 opioid-related fatal overdoses.[70] Additionally, intravenous drug use, frequently linked to heroin, has affected HIV rates in Arkansas. In 2017, an approximately 5,634 Arkansas residents were HIV-positive. Approximately 15.1% of male HIV cases and 17.1% of female HIV cases were attributed to intravenous drug use.[71]

---

[70] https://www.addictioncenter.com/rehabs/arkansas/little-rock/

[71] https://www.drugabuse.gov/drugs-abuse/opioids/opioid-summaries-by-state/arkansas-opioid-summary

154.    Rising opioid use and abuse also have negative social and economic consequences beyond overdoses, and opioid abuse and misuse. According to a recent analysis by a Princeton University economist, approximately one out of every three working age men who are not in the labor force take daily prescription pain medication. The same research finds that opioid prescribing alone accounts for 20% of the overall decline in the labor force participation for this group from 2014-16, and 25% of the decline in labor force participation among women.

155.    Further, people who are addicted to prescription opioid painkillers are 40 times more likely to be addicted to heroin. The CDC identified addiction to prescription pain medication as the strongest risk factor for heroin addiction. Nationally, roughly 80% of heroin users previously used prescription opioids. Studies have shown that heroin use is 19-times greater among individuals who reported past use of prescription pain relievers.

156.    Recently, the Drug Enforcement Administration's ("DEA") Little Rock office and various Arkansas law enforcement agencies took part in the "Operation Pilluted" campaign targeting abuse of prescription opioids in Arkansas, which former U.S. Attorney Christopher Thyer branded as "perhaps the greatest drug problem Arkansas currently faces."[72]

157.    In addition to the direct problems of adult addiction, abuse, and overdose, the opioid epidemic has created a ripple effect, touching lives across all age groups and straining public resources. Increased opioid use has been linked with increased emergency room visits for opioid-related problems and an increase in neonatal abstinence syndrome ("NAS").[73] NAS is a constellation of symptoms resulting from drug use during pregnancy.[74] Opioid use by pregnant

---

[72] Department of Justice, U.S. Attorney's Office, Eastern District of Arkansas, *140 Charged In Arkansas As Part of National Prescription Drug Initiative* (May 20, 2015), *available at* https://www.justice.gov/usao-edar/pr/140-charged-arkansas-part-national-prescription-drug-initiative (last visited Feb. 4, 2018).

[73] Kolodny, et al., *The Prescription Opioid and Heroin Crisis: A Public Health Approach to an Epidemic of Addiction*, at 560-561.

[74] Arkansas Department of Health, *Neonatal Abstinence Syndrome in Arkansas 2000–2014*, *available at* http://www.arkansaspmp.com/files/2017/NAS_Report_Final.pdf (last visited Feb. 9, 2018).

women increases the risk of NAS,[75] which increases the risk of pregnancy complications, including maternal death and stillbirth.[76] The rate of NAS diagnosis in Arkansas increased more than ten-fold between 2000 and 2014.[77] Babies diagnosed with NAS spend five times more days in the hospital, and medical care costs increase ten-fold as compared to babies born without NAS.[78]

158. Pulaski County has recognized a significant increase in opioid use disorder. According to a study conducted by the University of Arkansas for Medical Sciences. There has been an increase in inmates at the Pulaski County Jail, the largest jail in the State, who suffer from opioid use disorder. The findings of the study demonstrated the need for treatment programs in the jail to prevent both fatal and nonfatal overdoses.[79]

159. Additionally, the Counties have experienced an increase in crime due to the opioid epidemic that plagues the Counties, State and nation. In 2015, the Jefferson County Sherriff's Department, Little Rock Police Department, and other local, State, and national law enforcement agencies investigated and arrested a Little Rock-based doctor, Dr. Richard Duane Johns, who was charged with violating the Arkansas Controlled Substances Act. The doctor allegedly prescribed 39,000 pills, with a street value of more than $1,000,000. In 2017, the doctor plead guilty to conspiracy to distribute oxycodone without an effective prescription.[80]

160. Both Pulaski County and Jefferson County experienced a rise in the number of opioid prescriptions written for residents of the Counties. In 2010, the national average of opioid

---

[75] Arkansas Department of Health, *Prescription Monitoring Program Annual Report January-December 2016, available at* http://www.arkansaspmp.com/files/2017/2016_Annual_Report_FINAL.pdf (last visited Feb. 9, 2018).

[76] Ayumi Maeda, Brian T. Bateman, Caitlin Clancy, Andreea Creanga, Lisa Leffert, *Opioid Abuse and Dependence during Pregnancy: Temporal Trends and Obstetrical Outcomes,* 121 ANESTHESIOLOGY 1158 (Dec. 2014).
[77] Arkansas Department of Health, *Neonatal Abstinence Syndrome in Arkansas 2000–2014, available at* http://www.arkansaspmp.com/files/2017/NAS_Report_Final.pdf (last visited Feb. 9, 2018).
[78] Id.
[79] https://pubmed.ncbi.nlm.nih.gov/31195879/
[80] https://admin.dea.gov/press-releases/2017/03/02/physician-admits-illegally-distributing-39000-pills

prescriptions written was 87.2 prescriptions per 100 county residents. However, in Jefferson County, 92.8 opioid prescriptions were written for every 100 County residents, and in Pulaski County, 122.8 opioid prescriptions were written for every 100 County residents - both above the national average. In 2015, both Counties' prescription rates were still above the national average of 94.3 prescriptions per every 100 county residents. In Jefferson County, 112.4 opioid prescriptions were written per every 100 County residents, and in Pulaski County 111.6 prescriptions were written for every 100 County residents. The trend continued in 2017, when the national average was 94 opioid prescriptions for every 100 county residents. In Jefferson County 103.8 opioid prescriptions were written for every 100 County residents, and in Pulaski County 98.3 prescriptions were written for every 100 County residents. Upon information and belief, Walmart distributed and dispensed many of these prescriptions, and such a trend is just one example of how opioid have impacted the Counties. Further, the high prescription rates in both counties should have put Walmart on notice of the likelihood of diversion occurring in the Counties.

## V. CAUSES OF ACTION

### COUNT I
### Negligence/Gross Negligence

161.    The Counties re-allege and incorporate by reference all preceding paragraphs as if fully stated herein.

162.    Walmart distributes and dispenses opioids, a dangerous controlled substance.

163.    Based upon (a) Walmart's knowledge as a registrant pursuant to Arkansas and federal controlled substances laws; (b) the foreseeability of the effects of its actions or inactions in distributing and dispensing opioids; and (c) its control over the supply chain as detailed throughout

this Complaint, Walmart owes a duty of reasonable care in the distribution and dispensing of opioids.

164. Likewise, based upon (a) Walmart's knowledge as a registrant pursuant to Arkansas and federal controlled substances laws; (b) the foreseeability of the effects of its actions or inactions in distributing and dispensing opioids; and (c) its control over the supply chain as detailed throughout this Complaint, Walmart owes a duty of care not to endanger public health, welfare, or safety.

165. Schedule II controlled substances have "high potential for abuse," which "may lead to severe psychic or physical dependence," despite having a currently accepted medical use. ARK. CODE ANN. § 5-64-205; ARK. ADMIN. CODE § 060.00.1-7.

166. Arkansas law restricts distributors' ability to distribute Schedule II controlled substances like opioids by, among other things, requiring them to register to distribute opioids and maintain effective controls against diversion of the controlled substances that they distribute.

167. Arkansas Department of Health regulations require practitioners—which include wholesalers, and retailers of controlled substances—to maintain effective controls against opioid diversion. ARK. ADMIN. CODE § 007.07.2-II-III.

168. Department of Health regulations also require physicians and retail pharmacies to ensure that opioid prescriptions are issued for legitimate medical purposes. ARK. ADMIN. CODE § 007.07.2-II-VIII. Prescriptions "issued to an addict or habitual user of controlled substances, not in the course of professional treatment but for the purpose of providing the user with controlled substances sufficient to keep him/her comfortable by maintaining his/her use, is not a prescription" under the regulations. *Id.* at § 007.07.2-II-VIIIB(2).

50

169. The Arkansas CSA, UNDA, and their accompanying regulations, exist to prevent public harm threatened by narcotic drugs, which by definition are "dangerous to the public health" and "promotive of addiction-forming or addiction-sustaining results upon the user that threaten harm to the public health, safety, or morals[.]" ARK. CODE ANN. § 5-64-101(16)(A)(i). In failing to maintain effective controls against their diversion, it is foreseeable that controlled substances will be prescribed for illegitimate purposes, diverted by corrupt retailers, and abused by individuals who have fallen victim to their "high potential for abuse." ARK. CODE ANN. § 5-64-205. Likewise, it is foreseeable that states and counties, and cities, including Counties, will face extraordinary costs in responding to the ensuing epidemic in, *inter alia*, law enforcement, incarceration, court costs, medical treatment, blight, lost tax revenue, lost productivity, and other areas. Further, Walmart had actual knowledge of these types of activities and their effects.

170. In addition, the Arkansas UNDA imposes specific record-keeping requirements on wholesalers who are required to maintain detailed records of all inventory of narcotic drugs received by and disposed of by them. ARK. CODE ANN. § 20-64-209. The information required to be collected and maintained includes dates of production and distribution and contact information of the persons to whom or for whose use the drugs were sold, administered or dispensed. These requirements serve to prevent diversion and non-medical use of Walmart's products, as well as other controlled substances.

171. Walmart further owed the Counties a duty to refrain from, and enact policies to prevent, filling opioid prescriptions that would be deemed questionable or suspicious by a reasonably prudent pharmacist; a duty to train and supervise its employees at the point of sale to investigate or report suspicious or invalid prescriptions; a duty to check the state prescription

monitoring program before dispensing prescriptions; and a duty to protect against corruption or theft by its employees or agents.

172. Walmart had control over its own actions to ensure that it performed these requirements. It is foreseeable that Counties would be injured by the failure of Walmart to perform these duties, and Walmart had actual knowledge that its failure to perform these duties was causing harm to states, counties, and municipalities like Counties.

173. Walmart's conduct fell below the reasonable standard of care. Its negligent acts include:

- a. consciously oversupplying the market throughout the State and Counties with highly-addictive prescription opioids;
- b. using unsafe distribution and dispensing practices;
- c. disregarding the Arkansas statutes and regulations for safe distribution and dispensing;
- d. affirmatively enhancing the risk of harm from prescription opioids by failing to act as a last line of defense against diversion;
- e. inviting and enabling criminal activity in the State, counties, and cities by disregarding precautionary measures built into Arkansas law;
- f. failing to properly train or investigate its employees;
- g. failing to properly review controlled substance orders for red flags;
- h. failing to establish effective controls to combat diversion of opioids;
- i. failing to police the integrity of its supply chains;

174. Walmart sold opioids into the supply chain knowing both that (1) there was a substantial likelihood many of the sales were for non-medical purposes, and (2) opioids are an inherently dangerous product when used for non-medical purposes.

52

175. Walmart was negligent or reckless in not utilizing its special knowledge and special skills that relate to the dangerous activity in order to prevent or ameliorate such distinctive and significant dangers.

176. Controlled substances are dangerous commodities. Walmart breached its duty to exercise the degree of care, prudence, watchfulness, and vigilance commensurate to the dangers involved in the transaction of its business.

177. Walmart was also negligent or reckless in failing to guard against foreseeable third-party misconduct, e.g., the foreseeable conduct of: corrupt prescribers, corrupt pharmacists and staff, and/or criminals who buy and sell opioids for non-medical purposes.

178. Walmart is in a limited class of registrants authorized to legally dispense and distribute controlled substances. Walmart was in exclusive control of the management of the opioids it distributed to its retail stores throughout Arkansas. This places Walmart in a position of great trust and responsibility vis-à-vis the Counties. Walmart owes a special duty to the Counties; the duty owed cannot be delegated to another party.

179. The Counties are without fault, and their injuries and those of their citizens would not have happened in the ordinary course of events had Walmart used due care commensurate to the dangers involved in the distribution and dispensing of controlled substances.

180. The aforementioned conduct of Walmart foreseeably and proximately caused damage to the Counties, which have suffered an unprecedented epidemic of opioid addiction and overdose.

181. As a result of the epidemic, the Counties have shouldered tremendous costs that are not derivative of third-party injuries. The Counties' damages include, but are not limited to, increased emergency response costs, law enforcement costs, incarceration costs, court

53

administration costs, addiction treatment costs, and medical costs caused by Walmart's conduct in creating and exacerbating the opioid epidemic. High levels of sustained opioid drug abuse, also created or accelerated economic blight in some portion of the Counties resulting in diminished property values and a loss in tax revenue. The Counties have also suffered a loss of productivity in their workforces.

182. The opioid epidemic has caused the Counties to suffer future damages in the form of the increased expenses in providing public services that so far exceed the normal, expected costs that they are distinct from and unrelated to the normal provision of public services. Walmart's conduct was extraordinary, unexpected, and rare, and is a repeated course of conduct that did, does, and will continue to result in recurring costs to the Counties. The magnitude of the acts of Walmart were neither discrete nor of a sort that a state, county, or municipality, including the Counties, could reasonably expect to have to respond to at any time during their existence as such. It would be unreasonable, wrong, and inequitable not to allocate these expenses, and any other costs associated with the harms Walmart's wrongful conduct has caused, to the very parties responsible for creating the need for such extraordinary resources to be expended in the manner they must be in responding to the opioid epidemic.

183. As a direct result of Walmart's grossly negligent, willful, wanton, reckless, malicious, and/or intentional conduct, the Counties have suffered actual injury entitling them to an award of all compensatory damages incurred in the past and likely to occur in the future, and punitive damages.

## COUNT II
## Common Law Public Nuisance

184. The Counties re-allege and incorporate by reference all preceding paragraphs as if fully stated herein.

54

185.    The public nuisance is the over-saturation of opioids in the Counties, the adverse social and environmental outcomes associated with widespread opioid use, and the attendant endangerment of public health, welfare, and safety.

186.    Walmart substantially participated in and/or aided and abetted activities that caused the nuisance.

187.    Walmart caused the nuisance by failing to implement effective controls and procedures to guard against diversion in its distribution and dispensing of controlled substances, as discussed herein.

188.    Walmart had actual knowledge that the conditions created by its actions and inactions as described herein would in fact and did result in harm to the Counties.

189.    Walmart was driven by profits and had the intent to over-saturate the market with opioids and cause addiction in order to boost sales.

190.    Walmart's activities unreasonably interfere with the following common rights of the public in the Counties:

      a.    to be free from reasonable apprehension of danger to person and property;

      b.    to be free from the spread of disease within the community including the disease of addiction and other diseases associated with widespread opioid use;

      c.    to be free from negative health and safety effects of widespread illegal drug sales on premises in and around the State of Arkansas and the Counties;

      d.    to be free from blights on the community created by areas of illegal drug use and opioid sales;

      e.    to live or work in a community in which local businesses do not profit from using their premises to sell products that serve the criminal element and foster a secondary market of illegal transactions; and,

      f.    to live or work in a community in which community members are not under the influence of narcotics unless they have a legitimate medical need to use them.

191.    Walmart's interference with these public rights is unreasonable because it:

    a.    has harmed and will continue to harm the public health, safety, and welfare of the Counties' citizens;

    b.    has harmed and will continue to harm Counties' neighborhoods and communities by increasing the levels of vagrancy and property crime, and thereby interfering with the rights of the community at large;

    c.    is proscribed by Arkansas statutes, including the Arkansas Controlled Substances Act and Uniform Narcotic Drug Act;

    d.    is proscribed by Arkansas regulations, including those of the Department of Health and the Pharmacy Board; and

    e.    is of a continuing nature, and will produce long-lasting effects.

192.    The nuisance undermines the Counties' citizens' public health, safety, and welfare. It has resulted in increased crime and property damage within the Counties. It has resulted in high rates of addiction, overdoses, dysfunction, and despair within the Counties' families and entire communities, which threatens the fabric of the Counties' society.

193.    Public resources are being unreasonably consumed in efforts to address the prescription opioid epidemic, thereby eliminating available resources which could be used to benefit the public at large in the Counties.

194.    Walmart's nuisance-causing activities are not outweighed by the utility of its behavior. In fact, its behavior is illegal and has no social utility whatsoever. There is no legitimately-recognized societal interest in failing to maintain effective controls against opioid diversion.

195.    At all times, Walmart possessed the right and ability to control the nuisance-causing outflow of opioids from pharmacy locations or other points of sale into and around the Counties.

196.    As a direct and proximate result of the nuisance, the Counties' citizens have suffered in their ability to enjoy the rights of the public.

197.    The Counties have also suffered unique harms of a kind that is different from the

Counties' citizens at large, namely, that the Counites have been harmed in their  proprietary

interests.

198.    The effects of the nuisance can be abated, and the further occurrence of such harm

and inconvenience can be prevented.  Walmart has responsibility for doing so.

199.    Walmart should be required to pay the expenses the Counites' will incur in the

future to fully abate the nuisance, as well as punitive damages.

COUNT III
**Violations of the Arkansas Uniform Narcotic Drug Act,
ARK. CODE ANN. §§ 20-64-101, *et seq.*:
Civil Action by Crime Victim, ARK. CODE ANN. § 16-118-107**

200.    The Counties re-allege and incorporate by reference all preceding paragraphs as if

fully stated herein.

201.    ARK. CODE ANN. § 16-118-107 provides that "[a]ny person injured or damaged by

reason of conduct of another person that would constitute a felony under Arkansas law may file a

civil action to recover damages based on the conduct."

202.    The Arkansas Uniform Narcotic Drug Act ("UNDA") states, "It shall be unlawful

for any person to manufacture, purchase, possess, have under his control, sell, prescribe,

administer, dispense, or compound any narcotic drug, *except as authorized by this subchapter*."

ARK. CODE ANN. § 20-64-202 (emphasis added).

203.    "Narcotic drug[s]" are those that are "promotive of addiction-forming or addiction-

sustaining results upon the user which threaten harm to the public health, safety, or morals . . .

whether produced directly or indirectly by extraction from substances of vegetable origin or

independently by means of chemical synthesis, or by a combination of extraction and chemical

synthesis." ARK. CODE ANN. § 20-64-201(8).

204.    Any violation of the UNDA constitutes a felony. ARK. CODE ANN. § 20-64-220.

205.    The UNDA empowers the Arkansas Department of Health to "promulgate regulations for the efficient enforcement of th[e] act. . . ." ARK. CODE ANN. § 20-64-419. The Department has done so in its regulations under Division 7, Rule 2. *See* ARK. ADMIN. CODE §§ 007.07.2-I-I.

206.    Under authority of the UNDA, the Department mandates that "[a]ll Practitioners shall provide effective controls and procedures to guard against theft and diversion of controlled substances." ARK. ADMIN. CODE § 007.07.2-II-III. "Practitioners" include pharmacies, wholesalers, and distributors—i.e., Walmart. *Id.* § 007.07.2-II-I.

207.    Department of Health regulations further mandate that opioid prescriptions issue only for legitimate medical purposes. ARK. ADMIN. CODE § 007.07.2-II-VIIIB(1). Any physician or pharmacist who knowingly prescribes or dispenses a controlled substance for illegitimate purposes—that is, to "an addict or habitual user" to "keep him/her comfortable by maintaining his/her customary use"—commits a felony. *Id.* § 007.07.2-II-VIIIB(2).

208.    As described throughout this Complaint, Walmart has violated the UNDA by, *inter alia*:

>   a.    consciously oversupplying the market throughout Arkansas with highly-addictive prescription opioids;
>
>   b.    using unsafe distribution and dispensing practices;
>
>   c.    disregarding statutory and regulatory rules for safe distributing and dispensing;
>
>   d.    affirmatively enhancing the risk of harm from prescription opioids by failing to act as a last line of defense against diversion;
>
>   e.    inviting and enabling criminal activity in the State, counties, and cities by disregarding precautionary measures built into Arkansas law;
>
>   f.    failing to properly train or investigate its employees;

g.      failing to properly review controlled substance orders for red flags;

h.      failing to establish effective controls to combat diversion of opioids;

i.      failing to police the integrity of its supply chains;

j.      knowingly prescribing opioids for illegitimate purposes; and

k.      knowingly dispensing opioids for illegitimate purposes.

209.     As a direct result of Walmart's negligent, grossly negligent, knowing, willful, wanton, reckless, and/or intentional violations of the UNDA, the Counties have suffered actual injury entitling them to an award of all compensatory damages incurred in the past and likely to occur in the future, and punitive damages.

## COUNT IV
### Accomplice to Violations of the Arkansas Uniform Narcotic Drug Act, ARK. CODE ANN. §§ 5-2-403; 20-64-101, *et seq.*: Civil Action by Crime Victim, ARK. CODE ANN. § 16-118-107

210.     The Counties re-allege and incorporate by reference all preceding paragraphs as if fully stated herein.

211.     ARK. CODE ANN. § 16-118-107 provides that "[a]ny person injured or damaged by reason of conduct of another person that would constitute a felony under Arkansas law may file a civil action to recover damages based on the conduct."

212.     ARK. CODE ANN. § 5-2-403(a) provides that "[a] person is an accomplice of another person in the commission of an offense if, with the purpose of promoting or facilitating the commission of an offense, the person: (1) [s]olicits, advises, encourages, or coerces the other person to commit the offense; (2) [a]ids, agrees to aid, or attempts to aid the other person in planning or committing the offense; or (3) [h]aving a legal duty to prevent the commission of the offense, fails to make a proper effort to prevent the commission of the offense."

59

213.     As set out above, Walmart knowingly distributed and dispensed opioids in violation of the Arkansas UNDA and accompanying Arkansas Department of Health regulations. Walmart's unauthorized distribution and dispensing constitute felonies under the UNDA.

214.     To maximize profits, Walmart distributed and dispensed as many highly-addictive, and often deadly, pills as possible. To that end, Walmart transferred pills through the supply chain, from the distributor to the end user, and without regard for state law requiring it to take affirmative steps to prevent the diversion of drugs into the illegal marketplace or for other illegitimate purposes.

215.     Walmart continuously supplied opioids to its retail chain pharmacies, despite knowing that its pharmacies were habitually violating state law in dispensing opioids, despite knowing of widespread opioid diversion and abuse, and despite Walmart's duty to maintain effective controls to prevent diversion.

216.     Walmart and other retail stores continuously paid distributors of opioids to supply large quantities of prescription opioids and continuously dispensed them in order to satisfy demand for the drugs, despite knowing of their illegitimate or, at best, suspicious nature, despite knowing that Walmart was violating state law, and despite Walmart's duty to maintain effective controls to prevent diversion.

217.     As a direct result of Walmart's knowing, willful, wanton, reckless, and/or intentional conduct, the Counties have suffered actual injury entitling them to an award of all compensatory damages incurred in the past and likely to occur in the future, and punitive damages.

60

COUNT V

**Possessing, Delivering, and Trafficking Controlled Substances
in Violation of the Arkansas Controlled Substances Act,
ARK. CODE ANN. §§ 5-64-419, 5-64-424, 5-64-426, 5-64-427, and 5-64-440:
Civil Action by Crime Victim, ARK. CODE ANN. § 16-118-107**

218.    The Counties re-allege and incorporate by reference all preceding paragraphs as if fully stated herein.

219.    ARK. CODE ANN. § 16-118-107 provides that "[a]ny person injured or damaged by reason of conduct of another person that would constitute a felony under Arkansas law may file a civil action to recover damages based on the conduct."

220.    The Arkansas CSA directs the Arkansas Department of Health to classify certain substances that have "high potential for abuse" and "may lead to severe psychic or physical dependence" as Schedule II controlled substances. ARK. CODE ANN. § 5-64-205. Schedule II controlled substances include codeine, hydrocodone, hydromorphone, morphine, oxycodone, oxymorphone, tapentadol, dihydrocodeine, fentanyl, methadone, and pethidine (meperidine). ARK. ADMIN. CODE § 007.02.2.

221.    As discussed more fully above, the Arkansas CSA and accompanying Department of Health regulations permit Walmart to distribute and dispense controlled substances within Arkansas subject to its compliance with the Arkansas CSA and Department of Health regulations. Outside the bounds set by state law, possessing, delivering, and trafficking in controlled substances is unlawful.

222.    ARK. CODE ANN. § 5-64-419 provides that, except as authorized by the Arkansas CSA, it is unlawful to possess a Schedule II controlled substance. Such possession is a felony. *Id.*

61

223.   ARK. CODE ANN. § 5-64-424 provides that, except as authorized by the Arkansas CSA, it is unlawful to possess a Schedule II controlled substance with purpose to deliver. Such possession with purpose to deliver is a felony. *Id.*

224.   ARK. CODE ANN. § 5-64-426 provides that, except as authorized by the Arkansas CSA, it is unlawful to deliver a Schedule II controlled substance. Such delivery is a felony. *Id.*

225.   ARK. CODE ANN. § 5-64-440 provides that, except as authorized by the Arkansas CSA, it is unlawful to traffic a Schedule II controlled substance. Such trafficking is a felony. *Id.*

226.   As discussed above, Walmart unlawfully possessed, delivered, and trafficked controlled substances in Arkansas while knowingly ignoring its statutory and regulatory duties to, *inter alia,* maintain effective controls against opioid diversion.

227.   As a direct result of Walmart's negligent, grossly negligent, knowing, willful, wanton, reckless, and/or intentional violations of the CSA, the Counties have suffered actual injury entitling them to an award of all compensatory damages incurred in the past and likely to occur in the future, and punitive damages.

COUNT VI

**Accomplice to Violations of the Arkansas Controlled Substances Act,**
**ARK. CODE ANN. §§ 5-64-419, 5-64-424, 5-64-426, 5-64-427, and 5-64-440:**
**Civil Action by Crime Victim, ARK. CODE ANN. § 16-118-107**

228.   The Counties re-allege and incorporate by reference all preceding paragraphs as if fully stated herein.

229.   ARK. CODE ANN. § 16-118-107 provides that "[a]ny person injured or damaged by reason of conduct of another person that would constitute a felony under Arkansas law may file a civil action to recover damages based on the conduct."

230.   ARK. CODE ANN. § 5-2-403(a) provides that "[a] person is an accomplice of another person in the commission of an offense if, with the purpose of promoting or facilitating the

commission of an offense, the person: (1) [s]olicits, advises, encourages, or coerces the other person to commit the offense; (2) [a]ids, agrees to aid, or attempts to aid the other person in planning or committing the offense; or (3) [h]aving a legal duty to prevent the commission of the offense, fails to make a proper effort to prevent the commission of the offense."

231. As set out above, Walmart unlawfully possessed, delivered, and trafficked prescription opioids in violation of the Arkansas CSA and accompanying Department of Health regulations. Walmart's possession, delivery, and trafficking constitute felonies under Arkansas law.

232. To maximize profits, Walmart distributed, and dispensed as many highly-addictive, and often deadly, pills as possible. To that end, Walmart transferred pills through the supply chain, to the end user, and without regard for state law requiring them to take affirmative steps to prevent the diversion of drugs into the illegal marketplace or for other illegitimate purposes.

233. Walmart continuously distributed opioids to its retail stores despite its knowledge that these retail stores were habitually violating state law in dispensing opioids, despite knowing of widespread opioid diversion and abuse, and despite Walmart's duty to prevent diversion.

234. Walmart continuously dispensed large quantities of prescription opioids despite knowing of the prescriptions' illegitimate or, at best, suspicious nature, and despite Walmart's duty to prevent diversion.

235. As a direct result of Walmart's knowing, willful, wanton, reckless, and/or intentional conduct, the Counties have suffered actual injury entitling them to an award of all compensatory damages incurred in the past and likely to occur in the future, and punitive damages.

63

## COUNT VII
### Violations of the Arkansas Drug Dealer Liability Act,
### ARK. CODE ANN. §§ 16-124-101, *et seq.*

236. The Counties re-allege and incorporate by reference all preceding paragraphs as if fully stated herein.

237. The Arkansas Drug Dealer Liability Act ("DDLA") provides a civil remedy "for damages caused by use of an illegal drug by an individual." ARK. CODE ANN. § 16-124-104(a).

238. An "illegal drug" is any "drug whose distribution is a violation of the Uniform Controlled Substances Act." ARK. CODE ANN. § 16-124-102(1). Thus, opioids that Walmart possessed, delivered, trafficked, dispensed, or prescribed in violation of the Arkansas CSA and accompanying Department of Health regulations constitute "illegal drugs" under the DDLA.

239. The DDLA's remedies extend to "a medical facility, insurer, governmental entity, employer, or other entity that funds a drug treatment program or employee assistance program for the individual drug user, or that otherwise expended money on behalf of the individual drug user." ARK. CODE ANN. § 16-124-104(a)(4).

240. The Counties are governmental entities that fund drug treatment programs or have otherwise expended, and will continue to expend, money on behalf of illegal drug users. Indeed, prescription opioid diversion and the corresponding increase in abuse, addiction, and criminal activity has placed an **insurmountable demand** on the Counties' resources to meet the medical, public health, jail and prison, court, and law enforcement needs of their communities.

241. Under the DDLA, any "person who knowingly participates in the illegal drug market is liable for civil damages," ARK. CODE ANN. § 16-124-103(b), and the "illegal drug market" extends "from production to retail sales." *Id.* § 16-124-102(2).

242.    The DDLA imposes liability on those who directly participate in the distribution of an illegal drug that causes damage. This includes any "person who knowingly distributed, or knowingly participated in the chain of distribution of, an illegal drug that was actually used by the individual drug user." ARK. CODE ANN. § 16-124-104(b)(1).

243.    The DDLA also imposes market liability on those who participate in the illegal drug distribution in the area where the illegal drug causes damage. This includes any "person who knowingly participated in the illegal drug market if: (A) [t]he place of the illegal drug activity by the individual drug user is within the illegal drug market target community of the defendant; (B) [t]he participation of the defendant in the illegal drug market was connected with the same type of illegal drug used by the individual drug user; and (C) [t]he defendant participated in the illegal drug market at any time during the illegal drug use of the individual drug user." ARK. CODE ANN. § 16-124-104(b)(2).

244.    An individual drug user is "the individual whose illegal drug use is the basis of an action brought under" the DDLA. ARK. CODE ANN. § 16-124-102(4).  The Counties' residents who purchased or used Schedule II prescription opioids without valid and/or effective prescriptions are "individual drug users" under the DDLA.

245.    Walmart knowingly participated in the distribution and dispensing of prescription opioids that reached the Counties during all times relevant to this Complaint.  Walmart's "illegal drug market target community" is the entire State of Arkansas, because Walmart participated in the illegal drug market by distributing four or more ounces of "specified illegal drug[s]," that is, Schedule II controlled substances. ARK. CODE ANN. §§ 16-124-102(5), (14); 16-124-109(4).

246.     Walmart knowingly failed to implement effective controls and procedures to guard against theft, diversion, and abuse of prescription opioids in violation of the Arkansas CSA and Department of Health regulations.

247.     As a direct result of Walmart's knowing and/or intentional conduct, the Counties have suffered actual injury entitling them to an award of all damages available under the DDLA, including punitive damages.

## PRAYER FOR RELIEF

Despite the best efforts of the Counties, the Opioid Epidemic continues to infect the Counties. Absent the relief sought in this action, the resources of the State, Counties, and Cities will continue to be inadequate to respond to the epidemic.

WHEREFORE, the Counties respectfully pray:

A.     That the Counties recover all measures of damages allowable, and that judgment be entered against Walmart in favor of the Counties and for those damages to include, but not be limited to, prospective damages so that the Counties can,

(i) **comprehensively intervene in the Arkansas Opioid Epidemic:**

1.     to **prevent opioid use, injury, and death** through, *inter alia,* the purchase of naloxone kits for drug users, first responders, jailers, hospitals, schools, public buildings, and other appropriate recipients; and requisite training in the identification of overdose and proper naloxone administration;

2.     to **treat, cure, and prevent opioid misuse and addiction** through, *inter alia*, the creation of mental health clinics, opioid abuse treatment clinics, programs to increase public awareness of opioid addiction, programs to remove barriers to treatment and insurance coverage, and programs to increase physician awareness of opioid addiction; connecting Arkansas citizens to effective treatment, including medication-assisted treatment and telemedicine; and creating and disseminating educational materials for elementary schools, high schools, vocational schools, colleges and universities;

3.     to **reduce the supply of dangerous opioids** through, *inter alia*, testing and information-sharing so that law enforcement can better understand the

Arkansas Opioid Epidemic; creating overdose response teams; hiring and training of additional patrol officers and detectives, hiring and training of additional lab personnel, and hiring and training of additional personnel to optimize the Arkansas Prescription Monitoring Program; expanding efforts to provide clear guidance on safe disposal of prescription opioids; expanding take-back programs; creating linked and shared public health, healthcare, and criminal justice data related to the Arkansas Opioid Epidemic; and

4.  to **reduce crime and involuntary commitments associated with opioid addiction** through, *inter alia*, creating and expanding drug and mental health courts; crisis stabilization units; treatment options in jails and prisons; training of law enforcement, first responders, jailers, and others regarding crisis intervention and diversion; and prisoner re-entry programs; and

B.  Past damages and Restitution for monies spent by the Counties for those extraordinary and additional services provided which they would not have otherwise incurred but as a result of the Arkansas Opioid Epidemic and their past efforts to abate it.

C.  For an order directing Walmart to abate and pay the expenses required to abate fully the public nuisance it has caused;

D.  That the Counties recover the costs and expenses of suit, pre- and post-judgment interest, and reasonable attorneys' fees as provided by law;

E.  That Walmart be ordered to pay punitive and treble damages as provided by law;

F.  That the Counties recover an amount of money in excess of that required for federal jurisdiction in diversity of citizenship cases; and

G.  That the Court order such other and further relief as the Court deems just, necessary and appropriate.

## JURY TRIAL DEMANDED

The Counties demand a trial by jury on all claims to the maximum number of jurors

permitted by law, and preferential administration of this case—including an expeditious trial

setting—as required by Ark. Code Ann. § 16-106-101.

Respectfully submitted,

/s/ Scott P. Richardson
Dustin McDaniel
Scott Richardson
**McDANIEL, WOLFF & BENCA, PLLC**
1307 W. Fourth Street
Little Rock, AR 72201
Tel: (501) 954-8000
Fax: (866) 419-1601
dmcdaniel@mwbfirm.com
scott@mwbfirm.com
*Counsel for Pulaski County, Arkansas and Jefferson County, Arkansas*

Linda Singer (*Pro Hac Vice* to be submitted)
Sara Aguiñiga (*Pro Hac Vice* to be submitted)
Elizabeth Smith (*Pro Hac Vice* to be submitted)
**MOTLEY RICE LLC**
401 9th Street NW, Suite 1001
Washington, DC 20004
Tel: (202) 849-4965
Fax: (202) 386-9622
lsinger@motleyrice.com
saguiniga@motleyrice.com
esmith@motleyrice.com
*Counsel for Pulaski County, Arkansas and Jefferson County, Arkansas*