**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

PULASKI COUNTY, *et al.*,

        *Plaintiffs*,

    v.

WALMART INC., *et al.*,

        *Defendants*.

Case No.: 4:20-CV-00983-JM

## OPPOSITION TO PLAINTIFFS' MOTION TO REMAND AND MOTION TO EXPEDITE

Defendants Walmart Inc., Wal-Mart Stores East, LP, WSE Management, LLC, WSE Investment, LLC, and Wal-Mart Stores East, LLC (collectively, "Walmart") respectfully submit this opposition to Plaintiffs' Motion to Remand and Motion to Expedite, and Plaintiffs' supporting memorandum.  *See* ECF Nos. 6–8.

## INTRODUCTION

This lawsuit is one of more than 2,800 opioid-related lawsuits filed throughout the country against manufacturers, distributors, and retailers of prescription opioid medications, among others. On December 5, 2017, the Judicial Panel on Multidistrict Litigation ("JPML") created the Opiate Multidistrict Litigation pending in the Northern District of Ohio, *In re Nat'l Prescription Opiate Litigation*, No. 1:17-md-02804 (N.D. Ohio) ("Opiate MDL"), for cases just like this one, cases in which plaintiffs allege that "distributors failed to monitor . . . and report suspicious orders of prescription opiates." *In re Nat'l Prescription Opiate Litig.*, 290 F. Supp. 3d 1375, 1378 (J.P.M.L. 2017).  Thousands of cases have since been transferred to the Opiate MDL, including numerous cases from the Eighth Circuit.  The present case is factually and legally indistinguishable from those cases.

On August 20, 2020, Walmart removed this action on federal-question grounds.  *See* ECF No. 1.  The JPML has already issued a Conditional Transfer Order ("CTO"), conditionally transferring this case to the Opiate MDL.  *See* ECF No. 15-1 ("CTO-170").  Following its normal procedure, the JPML temporarily stayed that order to allow Plaintiffs the opportunity to file an opposition.  *Id.*  As with the thousands of cases before this one, at one of its upcoming hearings the JPML will ultimately order the case transferred to the Opiate MDL.  Thus, unless this Court intercedes, this case will transfer to the Opiate MDL.  That is where any issues related to Walmart's removal should be decided.

Therefore, this Court need not decide Plaintiffs' Motion to Remand.  Instead, this Court

should grant Walmart's Motion to Stay ("Stay Motion"), *see* ECF Nos. 15–16, and allow the JPML time to finalize its transfer decision.  Once transferred, the Opiate MDL will decide whether this case and all of the similar cases already pending before it should remain in federal court or be remanded.  That is the path followed by scores of judges across the country who have allowed at least 140 cases removed on federal-question grounds to transfer to the Opiate MDL over plaintiffs' remand motions.  *See* ECF No. 1, Ex. 9.

Should this Court decide to depart from those judges who have found a stay appropriate and reach Plaintiffs' Motion to Remand now, that motion should be denied for several reasons.

*First*, the federal aspect of this case is not, as Plaintiffs contend, some small element.  The sole source of Walmart's alleged duties underpinning this case is the federal Controlled Substances Act ("CSA"), and *only* the federal CSA.  Plaintiffs' claims rise or fall on the more than 30 paragraphs of their Complaint alleging violations of the CSA and related guidance from the federal Drug Enforcement Administration ("DEA").  *See, e.g.*, ECF No. 1, Ex. 1 (hereinafter "Compl.") ¶¶ 51, 59, 60, 62–76, 81–92, 103–04, 130–31, 136.  As the Eighth Circuit stated recently, "Plaintiffs elected to premise these [state law] claims on violations and interpretations of federal law."  *Wullschleger v. Royal Canin U.S.A., Inc.*, 953 F.3d 519, 521–22 (8th Cir. 2020).

*Second*, Plaintiffs' citations in their Motion to Remand do not allow them to run from their own allegations.  Plaintiffs repeatedly refer to the "uniform action of the federal courts" that purportedly supports their position.  ECF No. 7 at *1.  But simply saying something does not make it so.  To the contrary, against the handful of cases cited in Plaintiffs' papers stand more than 140 cases that have already been transferred to the Opiate MDL and that raise the same jurisdictional issues.  Those cases are in the Opiate MDL because scores of federal judges across the country allowed the JPML to finalize its transfer decision.  *See* ECF No. 1, Ex. 9; *see also* Order at *1, 3,

*Takoma Reg'l Hosp., Inc. v. Purdue Pharma, L.P.*, No. 2:19-cv-157 (E.D. Tenn. Oct. 4, 2019) ("Staying this case, then, appears to be the default against which Plaintiffs operate.") (previously attached as ECF No. 1, Ex. 6).

*Third*, Plaintiffs repeatedly invoke the specter of an "urgent public health crisis" and argue that the speedy adjudication of this case, brought only against Walmart, will be instrumental in resolving it.  ECF No. 7 at *5.  But this Court's jurisdiction is not impacted by Plaintiffs' views on the best forum to litigate their case.  Nor is the propriety of transfer to the Opiate MDL before this Court.  The JPML will make that determination and has already found thousands of times that the Opiate MDL is the best forum for opioid cases like this one.  And even if Plaintiffs' references had any relevance (they do not), litigating a standalone case against one defendant will not "remedy" any "public health crisis."  As Plaintiffs' separate suit against more than thirty manufacturers, distributors, pharmacies, and prescribers of opioids demonstrates, Walmart is alleged to only play a limited role in the conduct Plaintiffs assert damaged them.  *See State of Arkansas ex rel. Scott Ellington v. Purdue Pharma, L.P.*, No. 18CV-2018-268 (Cir. Ct. Crittenden Cty.).  For example, Walmart did not manufacture opioids, sponsor or disseminate research regarding the safety or efficacy of opioids, or promote opioids to prescribers or patients.  Walmart distributed FDA-approved opioid medications exclusively to its own pharmacies, and Walmart pharmacists filled prescriptions that were written by prescribers who were authorized to write prescriptions by the relevant authorities.  Walmart looks forward to demonstrating that Plaintiffs' allegations about its conduct are false at the appropriate time and in the appropriate forum—the Opiate MDL.

To the extent the Court decides to reach Plaintiffs' Remand Motion (which it should not), the motion should be denied.

- 3 -

## BACKGROUND

Plaintiffs initiated this action on July 21, 2020, in the Circuit Court of Jefferson County, Arkansas, case number 35CV-20-503.  On August 20, 2020, Walmart timely removed this case to this Court asserting that federal-question jurisdiction existed under the CSA and its implementing regulations.  *See* ECF No. 1.[1]  On August 24, 2020, Plaintiffs filed a Motion to Remand and a Motion to Expedite.  *See* ECF Nos. 6–8.  On August 28, 2020, the JPML issued its CTO, finding that this action appears to "involve questions of fact that are common to the actions previously transferred to the Northern District of Ohio and assigned to Judge Polster."  CTO-170 at *1.  On August 31, 2020, Walmart filed a Stay Motion.  *See* ECF Nos. 15–16.

## ARGUMENT

## I.   THIS COURT SHOULD STAY THIS ACTION PENDING THE FORTHCOMING TRANSFER DECISION.

As an initial matter, and as set forth more fully in Walmart's Stay Motion, this Court should not decide Plaintiffs' motion to remand on an expedited basis or at all.  *See* ECF No. 16.  Plaintiffs' allegations are nearly identical to the allegations in thousands of opioid lawsuits that have been transferred to the Opiate MDL.  The JPML has entered a CTO, finding that this case appears to "involve questions of fact that are common to the actions previously transferred to the Northern District of Ohio and assigned to Judge Polster."  CTO-170 at *1.  As is the JPML's typical procedure, that order is currently stayed to allow Plaintiffs to file an opposition.  *Id.*  This procedural posture "weighs in favor of granting a stay."  *City of Henderson v. Purdue Pharma L.P.*, 2020 WL 428112, at *4 (E.D. Ky. Jan. 27, 2020).

Because the JPML has already transferred numerous cases from federal courts in the Eighth

---

[1] The named Walmart entities all joined in the filing of the notice of removal, and are the only defendants in this action.  *See* ECF No. 1 ¶ 56.

Circuit[2] and other district courts across the country, it is likely that this case will be transferred as well.  Once transferred, the Opiate MDL will decide whether this case and all of the similar cases already pending before it should remain in federal court or be remanded.  That is precisely the purpose of multidistrict litigation—to conserve judicial resources and ensure consistency in rulings—and it prevents defendants from being forced to litigate the same issues in multiple courts.[3]

These same concerns hold true here.  In fact, more than 140 cases removed on federal-question grounds have been transferred to the Opiate MDL while remand motions were pending with the district court.  *See* ECF No. 1, Ex. 9.  More than 80 of those cases were stayed pending

_____

[2] *See, e.g.*, *Barton Cty. v. Allergan PLC*, No. 4:20-cv-00387 (E.D. Mo. Jun. 3, 2020); *Lawrence Cty. v. Allergan PLC*, No. 4:20-cv-00076 (E.D. Mo. Mar. 30, 2020); *Vernon Cty. v. Allergan PLC*, No. 4:19-cv-03302 (E.D. Mo. Mar. 30, 2020); *Ray Cty. v. Allergan PLC*, No. 4:19-cv-03300 (E.D. Mo. Mar. 30, 2020); *Clinton Cty. v. Allergan PLC*, No. 4:19-cv-03169 (E.D. Mo. Mar. 30, 2020); *Henry Cty. v. Allergan PLC*, No. 4:20-cv-00077 (E.D. Mo. Mar. 30, 2020); *Pike Cty. v. Allergan PLC*, No. 4:19-cv-03170 (E.D. Mo. Mar. 30, 2020); *Polk Cty. v. Allergan PLC.*, No. 4:20-cv-00199 (E.D. Mo. Feb. 24, 2020); *Camden Cty. v. Williams*, No. 4:19-cv-02930 (E.D. Mo. Feb. 5, 2020); *Lincoln Cty. v. Sackler*, No. 4:19-cv-02953 (E.D. Mo. Feb. 5, 2020); *St. Francois Cty. v. Williams*, No. 4:19-cv-01722 (E.D. Mo. Oct. 2, 2019).

[3] *See, e.g.*, Order at *2, *Marion Hosp. Corp. v. Abbott Labs.*, No. 1:20-cv-04111 (N.D. Ill. Aug. 25, 2020) (staying case in part because "Defendants represent—and Plaintiffs do not appear to dispute—that several other cases in the MDL have presented similar or identical jurisdictional issues") (previously attached as ECF No. 15-3); Order at *4, *City of Fairfax v. Mallinckrodt PLC*, No. 1:20-cv-00218 (E.D. Va. Apr. 30, 2020) (granting motion for stay in part because "[j]udicial review of threshold [jurisdictional] issues is a prime opportunity for judicial economy and efficiency in a centralized MDL") (previously attached as ECF No. 1, Ex. 3); Order at *5, *Dallas Cty. Hosp. Dist. – Parkland Mem'l Hosp. v. Amneal Pharm., LLC*, No. 4:19-cv-04834 (S.D. Tex. Jan. 28, 2020) ("Granting a stay would further judicial economy by avoiding duplicative litigation and preventing inconsistent rulings.  If the JPML transfers this case to the Opiate MDL, Plaintiffs will have the opportunity to present their motion to remand to Judge Polster, where it may be addressed along with other pending motions to remand using a unified framework.") (previously attached as ECF No. 1, Ex. 4); Order at *3, *Cty. of Jim Hogg v. Purdue Pharma L.P.*, No. 4:19-cv-02816 (S.D. Tex. Sept. 4, 2019) ("The pending motion to remand presents factually and legally difficult issues.  Other cases consolidated before the MDL transferee court in Ohio present similar removal issues, making a stay appropriate to avoid duplicative litigation of those issues, to improve judicial economy, and to reduce the risk of inconsistent results.") (previously attached as ECF No. 1, Ex. 7); *see also* ECF No. 16 at *7–8.

transfer.  *Id.*  For example, in *Takoma Regional Hospital*, defendants removed the action and plaintiffs sought remand.  Finding that the case was just "like so many other[] [opioid cases] around the nation," the court granted a stay and deferred a decision on the plaintiffs' motion to remand to allow Judge Polster to "issue a uniform ruling on the matter, minimizing the risk of inconsistency." Order at *1, 3, *Takoma Reg'l Hosp.* (previously attached as ECF No. 1, Ex. 6); *see also, e.g.*, Order at *4, *City of Orlando v. CVS Health Corp.*, No. 6:20-cv-00736, (M.D. Fla. June 15, 2020) ("Ruling on the Remand Motion now when the JPML may transfer the case to the Opiate MDL would risk inconsistent rulings and waste judicial resources.") (previously attached as ECF No. 1, Ex. 2); Order at *5, *Bd. of Cty. Comm'rs of Seminole Cty. v. Purdue Pharma, L.P.*, No. 6:18-cv-00372 (E.D. Okla. Apr. 3, 2019) (stating that "at first blush, jurisdiction does not appear to be lacking in this case," and concluding "the existence of these difficult questions of jurisdiction weigh in favor of their resolution by one court making similar rulings in hundreds of similar cases") (previously attached as ECF No. 1, Ex. 8).

Plaintiffs cannot seriously argue they will be prejudiced by a stay before this Court, as the JPML has already started to act on this case, and the JPML finalizes its decisions expeditiously. *See, e.g., Cty. of Jim Hogg* ("The potential prejudice to the County if a stay is granted is from delay.  That potential for prejudice is reduced by the relatively expeditious pace of the JPML's decision on transfer.") (previously attached as ECF No. 1, Ex. 7); Order at *5, *City of Orlando* ("As to Plaintiff's prejudice, any delay from the stay would be minimal as transfer briefing closes [in the near future] and a decision is expected soon after . . . .") (previously attached as ECF No. 1, Ex. 2).

Instead Plaintiffs argue that their remand motion may not be timely addressed in the Opiate MDL following transfer.  *See* ECF No. 7 at *4.  Numerous courts have already rejected that

concern.  *See Henderson*, 2020 WL 428112, at *4 ("To acknowledge such an argument as persuasive would call into question the usefulness of any MDL proceeding."); *see also, e.g.*, Order at *5, *City of Fairfax* ("[B]oth parties will benefit from centralized litigation at this stage.") (previously attached as ECF No. 1, Ex. 3); Order at *3–4, *Takoma Reg'l Hosp.* (explaining "months of delay in a case that would . . . probably take years to resolve is [not] likely to yield serious prejudice," but rather, is "simply the price of uniformity, which has long been—and for good reason—a central goal of the federal judiciary") (previously attached as ECF No. 1, Ex. 6); Order at *3.  Nor are Judge Polster's case management choices relevant to the propriety of a stay while this case is pending in this court.  *See* Order at *4–5, *Cty. of Alameda v. Purdue Pharma L.P.*, No. 3:19-cv-02307, ECF No. 29 (N.D. Cal. June 10, 2019) ("[T]his Court is not the appropriate forum for second-guessing Judge Polster's case management.").

Regardless, Plaintiffs would not be prejudiced by litigating their case in the Opiate MDL. The parties have made substantial progress there: discovery has been active for more than a year, including comprehensive written discovery, approximately 300 defense depositions, tens of millions of documents produced, and dozens of expert reports and depositions.  The initial claims set for trial already have been resolved, and the next trial is slated for later this fall.  On the other hand, in Plaintiffs' separate state court case against more than 30 other members of the prescription opioid supply chain, the parties are still arguing motions to dismiss after more than two years.  No prejudice will result from this case proceeding in the Opiate MDL.

A stay is warranted to best serve judicial efficiency and ensure consistent treatment of an action nearly identical to thousands of others.  *See Henderson*, 2020 WL 428112, at *4 ("Given the fact that thousands of similar cases have been transferred already, and the likelihood of many more cases being in a similar procedural posture, the interests of judicial economy and the threat

of inconsistent rulings outweighs any potential prejudice to the Plaintiffs . . . .").  The overwhelming weight of recent authority supports staying cases to allow the Opiate MDL to decide jurisdictional issues in a common fashion.  *See* ECF No. 1, Ex. 9.  That same result should hold here.

## II.   THIS COURT HAS FEDERAL-QUESTION JURISDICTION.

Although this Court need not reach the issue for the reasons explained, this Court plainly has federal-question jurisdiction.  "[F]ederal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress."  *Gunn v. Minton*, 568 U.S. 251, 258 (2013); *see also Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 315 (2005) (same).  The most recent controlling authority from the Eighth Circuit, as well as other decisions by courts around the country, have found these factors are satisfied in cases where state-law claims are predicated on violations of federal statutes governing complex, nationwide regulatory schemes for which uniformity is essential (such as the CSA).  *See Wullschleger v. Royal Canin U.S.A., Inc.*, 953 F.3d 519, 522 (8th Cir. 2020) (reversing remand order by district court where state-law claims involving FDA labeling were "premise[d] . . . on violations and interpretations of federal law");[4] *see also PNC Bank, N.A. v. PPL Elec. Utils. Corp.*,

---

[4] Plaintiffs completely ignore *Wullschleger* in their remand motion—the most recent, published Eighth Circuit decision on point—and cite instead *Great Lakes Gas Transmission Limited Partnership v. Essar Steel Minnesota LLC*, 843 F.3d 325 (8th Cir. 2016).  ECF No. 7 at *6–8, 12, 16.  But *Great Lakes* is not on point.  That case involved a breach-of-contract action and the question whether interpretation of a federal tariff raised a federal question when that tariff was required to be interpreted under state law.  *See* 843 F.3d at 326–27, 331–32.  Because the tariffs were to be interpreted under state—not federal—law, the case "could not promote national uniformity" and presented "no 'serious federal interest in claiming the advantages thought to be inherent in a federal forum.'"  *Id.* at 332–33 (quoting *Grable*, 545 U.S. at 313).  Here Plaintiffs' claims require the interpretation of federal law—specifically, the CSA and its implementing

189 F. App'x 101, 104 n.3 (3d Cir. 2006) (concluding state-law claim based on alleged violation of the Internal Revenue Code "gives rise to federal-question jurisdiction" under *Grable*).[5]  Not only does Plaintiffs' action satisfy all four factors, but removal is especially proper because the action is indistinguishable from the more than 2,800 actions currently pending in the Opiate MDL.

A.   **The Complaint "necessarily raises" a federal issue.**

Plaintiffs' state-law claims "necessarily raise" a federal question because the asserted right to relief under state law necessarily requires resolution of a federal question.[6]  *See Wullschleger*, 953 F.3d at 522 (concluding resolution of state-law claims "depend[ed] on federal law" where those claims could "not stand alone" from federal law); *see also North Carolina ex rel. N.C. Dep't of Admin. v. Alcoa Power Generating, Inc.*, 853 F.3d 140, 146 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 981 (2018) ("[W]here the vindication of a right under state law necessarily turns on some construction of federal law, the claim arises under federal law and thus supports federal question

---

regulations—and allowing that interpretation to be made by the Opiate MDL will "promote national uniformity."  *Great Lakes*, 843 F.3d at 333; *infra* pp. 16–20.

[5] *See also New York ex rel. Jacobson v. Wells Fargo Nat'l Bank*, 824 F.3d 308, 315–18 (2d Cir. 2016) (concluding state-law claims based on defendant's alleged violation of Internal Revenue Code satisfied *Grable*); *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1022 (2d Cir. 2014) (concluding state-law claims premised on violations of "federal law duties" arising under Exchange Act "necessarily raise disputed issues of federal law of significant interest to the federal system as a whole"); *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 196 (2d Cir. 2005) (concluding state-law claims premised on cable provider's alleged violations of federal Communication Act's uniform rate requirement satisfy "*Grable* test for federal-question removal jurisdiction"); *Ranck v. Mt. Hood Cable Regulatory Comm'n*, 2017 WL 1752954, at *5 (D. Or. May 2, 2017) (concluding state-law claims based on violations of Cable Communications Policy Act satisfy *Grable*).

[6] It is not necessary for federal jurisdiction that Walmart establish that all of Plaintiffs' claims raise a federal question.  Even if Plaintiffs could prove one or more of their claims without establishing a violation of federal law, this Court still has federal-question jurisdiction: "Nothing in the jurisdictional statutes suggests that the presence of related state law claims somehow alters the fact that [the] complaints, by virtue of their federal claims, were 'civil actions' within the federal courts' 'original jurisdiction.'"  *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 166 (1997); *see also* 28 U.S.C. § 1367(a).

jurisdiction under 28 U.S.C. § 1331." (alteration and internal quotation marks omitted)); *Bd. of Comm'rs of Se. La. Flood Prot. Auth.–E. v. Tenn. Gas Pipeline Co.* ("*Louisiana Flood*"), 850 F.3d 714, 722–23 (5th Cir. 2017) (concluding federal question necessarily raised where negligence and public nuisance claims relied on the court's interpretation of the scope of a duty of care contained in federal law); *Evergreen Square of Cudahy v. Wis. Hous. & Econ. Dev. Auth.*, 776 F.3d 463, 467 (7th Cir. 2015). Because the only possible source of Walmart's alleged duties is the federal CSA, the scope of which the parties will debate, federal law is necessarily raised and the first *Grable* factor is satisfied.

  Here, Plaintiffs' claims necessarily raise federal issues because they are premised expressly on Walmart's alleged violations of purported legal duties that arise out of the CSA and its implementing regulations—*i.e.*, the duties to monitor, report, and prevent suspicious shipments of otherwise lawful orders of controlled substances. *See, e.g.*, Compl. ¶¶ 6, 51, 59–60, 62–76, 81–92. Because the duties governing reporting and shipping "suspicious" opioid orders arise solely from the CSA and its implementing regulations, alleged violations of federal law form the basis of Plaintiffs' claims. *See, e.g.*, 21 U.S.C. § 823(b), (e) (identifying the question whether a distributor has maintained "effective control against diversion" as one factor the DEA may consider in evaluating whether the distributor should be licensed to operate); *id.* § 832 (imposing requirements to identify and report suspicious orders); *id.* § 842(c)(1)(B) (setting penalty for failure to comply with requirements related to suspicious orders or for failing to "maintain effective controls against diversion of opioids"); 21 C.F.R. § 1301.74(b) (requiring distributors of controlled substances to "design and operate a system" that identifies "suspicious orders of controlled substances" and to report such orders to the DEA).

  For example, Plaintiffs allege that Walmart breached duties under federal law "to maintain

effective controls to prevent diversion and to monitor and report, and reject suspicious orders of controlled substances," Compl. ¶ 6, "to register to distribute and/or dispense controlled substances," *id.* ¶ 60, to "not fill or ship any suspicious prescription or order unless it has conducted an adequate investigation and determined that the prescription or order is not likely to be diverted into illegal channels," *id.* ¶ 73, and "to monitor for red flags," *id.* ¶ 91.  These and other examples demonstrate that Plaintiffs' claims rest squarely on their allegations that Walmart breached duties arising out of the CSA and its attendant federal regulations.

Although Plaintiffs claim that Arkansas law impose duties on distributors of prescription medications to monitor, report, and halt prescription orders, *see, e.g.*, Compl. ¶ 61, none actually do.  Indeed, Plaintiffs identify no state law—common law or statute—giving rise to the purported duties regarding the distribution of opioids that Walmart allegedly breached.  The only state-law authority Plaintiffs cite establishes certain storage requirements for practitioners, *see* Ark. Admin. Code § 007.07.2-II-III (requiring Schedule I–VI controlled substances to be "stored under double-lock security in a substantially constructed, permanently mounted cabinet"), and record-keeping requirements for manufacturers and wholesalers, *see* Ark. Code Ann. § 20-64-209(2).  It also requires wholesale pharmaceutical distributors to report instances of theft or loss.  *See* Ark. Admin. Code § 007.07.2-II-IV, subd. A (requiring reports on DEA Form 106 covering physical theft).[7]

When there is no "state law grounding for the duty that the [plaintiff] would need to establish for the Defendants to be liable," and the "duty would have to be drawn from federal law," a federal court has jurisdiction over that claim.  *Louisiana Flood*, 850 F.3d at 723 (concluding

---

[7] Plaintiffs argue a state-law claim that "incorporates federal requirements" is insufficient to raise a federal question.  ECF No. 7 at *17 n.7.  But Plaintiffs' Complaint does more than "incorporate" the federal CSA.  Plaintiffs' Complaint points to federal law and only federal law as the exclusive source for the alleged duties.  Thus, Plaintiffs' claims against Walmart "cannot be adjudicated without reliance on and explication of federal law."  *Wullschleger*, 953 F.3d at 522.

federal-question jurisdiction exists because claims were premised on failure to satisfy a standard of care established in a federal statute); *see also Wullschleger*, 953 F.3d at 522 (concluding federal-question jurisdiction exists where "plaintiffs' isolated focus on their alleged state law claims is nothing more than an apparent veil to avoid federal jurisdiction"); *Hughes v. Chevron Phillips Chem. Co.*, 478 F. App'x 167, 170–71 (5th Cir. 2012) (holding plaintiff's state-law claims gave rise to federal-question jurisdiction because their resolution relied on a duty contained in federal law). Accordingly, Plaintiffs here necessarily rely on violations of federal law for their claims.

Seeking to avoid the consequences of their own pleading, Plaintiffs' assert that the "uniform action of the federal courts" has been to remand opioid cases. ECF No. 7 at *1. But that simply is not true. Far from "uniform," as Walmart's Stay Motion makes clear, those cases are a minority compared to the far greater number of decisions granting stays pending transfer to the Opiate MDL. Indeed, the fact that a minority of courts are out of step with the weight of authority emphasizes the need for the uniformity that the Opiate MDL provides. *See* ECF No. 1, Ex. 9. In particular, Plaintiffs argue this Court should follow a decision from the Western District of Arkansas, *Fayetteville Ark. Hosp. Co. v. Amneal Pharm., LLC*, 2020 WL 2521515 (W.D. Ark. May 18, 2020). *See* ECF No. 7 at *3–4, 9. But, as discussed in Walmart's Stay Motion, *Fayetteville* is not binding on this Court and did not consider the most recent Eighth Circuit precedent. *See* ECF No. 16 at *9–11. The *Fayetteville* court concluded no federal question was presented because the plaintiffs ostensibly "relied on state statutory and common law theories for each of their claims," and whether those were an "adequate basis for the duties [plaintiffs] ascribe to Defendants" was "a matter of state law and will not require any interpretation or application of the CSA." 2020 WL 2521515, at *2. That approach is not consistent with the Eighth Circuit's

most recent guidance in *Wullschleger v. Royal Canin U.S.A., Inc.*, 953 F.3d 519 (8th Cir. 2020).[8] There, plaintiffs brought antitrust and unjust enrichment claims under Missouri state law. *See id.* at 520. The Eighth Circuit did not stop its analysis with the fact that plaintiffs alleged state law causes of action, but rather examined the allegations supporting those causes of action to determine whether their adjudication would turn on the consideration of federal law. *See id.* at 521–22. The alleged violations of Missouri law were "premise[d]" on the "claim that defendants violated" federal statutes, "were non-compliant with" federal regulatory guidance, and refused to submit to federal regulatory review. *Id.* Federal-question jurisdiction existed because "[p]laintiffs' dependence on federal law permeates the allegations such that the antitrust and unjust enrichment claims cannot be adjudicated without reliance on and explication of federal law." *Id.* at 522.[9] That same "dependence" exists here as demonstrated by the more than 30 paragraphs of Plaintiffs' complaint that point to the CSA and the DEA's guidance regarding the CSA as the basis for Walmart's alleged duties. *See* ECF No. 16 at *10–11.

In fact, plaintiffs' practices in related opioid litigation make abundantly clear that these cases "necessarily raise" a federal question. For example, the plaintiffs in the Opiate MDL (represented by the same national counsel as Plaintiffs here) filed a motion (in support of, among other claims, alleged violations of Ohio's RICO statute and public nuisance law) asking Judge Polster to rule that registrants under the federal CSA have a statutory and regulatory duty to monitor, investigate, and halt suspicious orders of opioids. *See* Br. at *3–9, *In re Nat'l Prescription*

---

[8] *Wullschleger* was decided very shortly before *Fayetteville*, and the parties apparently did not bring it to the *Fayetteville* court's attention.

[9] The Eighth Circuit also noted that plaintiffs included declaratory and injunctive relief targeting federal law, but the Eighth Circuit's guidance on how to analyze the relationship between state-law claims and federal-law allegations was not dependent on that portion of its opinion. *See Wullschleger*, 953 F.3d at 522 (noting its decision considered both the "allegations in the complaint and relief sought").

*Opiate Litig.*, No. 1:17-md-02804, ECF No. 1887 (N.D. Ohio July 19, 2019).  In his August 19, 2019 opinion, Judge Polster considered the CSA and DEA's implementing regulations and the duties imposed by them, and then "examine[d] what the Defendants actually did compared to what the law requires."  *See* Order at 5, *In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-02804, ECF No. 2483 (N.D. Ohio Aug. 19, 2019).  Similarly, plaintiffs in the Opiate MDL and the New York state cases have both offered analysis from James Rafalski, a former DEA investigator, in support of their state-law claims.  Tellingly, Mr. Rafalski's reports rely exclusively on analysis of federal law, federal regulations, and DEA guidance.  For example, Mr. Rafalski's New York report spends thirty pages analyzing the "applicable regulatory mechanisms," without citing to New York law a single time.  *See In re Opioid Litig.*, Index No. 400000/2017, NYCSEF Doc. No. 5214 at *12–41 (N.Y. Sup. Ct. Suffolk Cty. Mar. 4, 2020).  Instead, Mr. Rafalski analyzes the federal CSA, its regulatory framework, and various DEA guidance and administrative actions.  *See id.*

Plaintiffs also suggest that Judge Polster "has already rejected [Walmart's] jurisdictional argument."  ECF No. 7 at *4.  But Plaintiffs once again overstate their citations.  In *In re National Prescription Opiate Litigation*, 2019 WL 180246 (N.D. Ohio Jan. 14, 2019), Judge Polster remanded a case brought by the Commonwealth of Kentucky, noting he had "already recognized that [he] has no jurisdiction over state cases filed by state attorneys general."  *Id.* at *2; *see also Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 21 n.22 (1983) ("[C]onsiderations of comity make us reluctant to snatch cases which a State has brought from the courts of that State . . . .").[10]  *In re National Prescription Opiate Litigation*, 2018

---

[10] Several of Plaintiffs' cited cases were brought by state attorneys general.  *See New Mexico ex rel. Balderas v. Purdue Pharma L.P.*, 323 F. Supp. 3d 1242 (D. N.M. 2018) (New Mexico); *Oklahoma ex rel. Hunter v. Purdue Pharma L.P.*, No. CIV-18-574-M (W.D. Okla. Aug. 3, 2018) (Oklahoma); *Delaware ex rel. Denn v. Purdue Pharma L.P.*, 2018 WL 1942363 (D. Del.

WL 4019413 (N.D. Ohio Aug. 23, 2018), is also inapposite.  That case involved an entirely different federal statute as grounds for removal—regulations promulgated by the Food & Drug Administration ("FDA").  *Id.* at *3.

Federal law permeates Plaintiffs' Complaint, and Plaintiffs make no effort to explain how this case may be "adjudicated without reliance on and explication of federal law."  *Wullschleger*, 953 F.3d at 522.  Plaintiffs' Complaint "necessarily raises" a federal question—the scope and meaning of Walmart's alleged duties under the federal CSA and its implementing regulations.

**B.  The parties "actually dispute" the federal issue.**

The federal issues raised in Plaintiffs' Complaint are "actually disputed."  In particular, the parties dispute the existence and scope of alleged duties arising under the CSA and whether Walmart violated any duties to monitor, detect, investigate, and report suspicious orders under the CSA.  This federal issue is the "central point of dispute," *Gunn*, 568 U.S. at 259, and the second *Grable* factor is met.  Plaintiffs cannot avoid an actually disputed federal issue simply by not expressly pleading a federal claim—especially where, as here, the Complaint repeatedly alleges violations of obligations arising under federal law.  Indeed, Plaintiffs do not meaningfully contend that the federal issue in this case is not "disputed."  *See* ECF No. 7 at *10–12 (stating in headers that there is no "Disputed Federal Issue," but making no substantive argument).

**C.  The federal issue is "substantial."**

The federal issue presented is substantial, because the federal government has a strong interest in a nationally uniform approach to controlled substances.  *See Gunn*, 568 U.S. at 260. "The substantiality inquiry under *Grable* looks . . . to the importance of the issue to the federal

---

Apr. 25, 2018) (Delaware); *West Virginia ex rel. Morrisey v. McKesson Corp.*, 2017 WL 357307 (S.D. W. Va. Jan. 24, 2017) (West Virginia).

system as a whole." *Id.*  Contrary to Plaintiffs' assertions, *see* ECF No. 7 at *12–15, this factor is met because Congress recognized that the illegal uses of controlled substances "have a substantial and detrimental effect on the health and general welfare of the American people" and that "[f]ederal control of the intrastate incidents of the traffic in controlled substances is essential to the effective control of the interstate incidents of such traffic."  21 U.S.C. § 801(2), (6).  Indeed, this is one of the primary reasons over 2,800 cases—raising nearly identical issues—are currently pending in the Opiate MDL.  In enacting the CSA, Congress stated that it was "providing the legitimate drug industry with a *unified* approach to narcotic and dangerous drug control."  H.R. Rep. No. 91-1444 (1970), *as reprinted in* 1970 U.S.C.C.A.N. 4566, 4572 (emphasis added).  The federal courts and the Opiate MDL court are best positioned to uniformly interpret these duties.  Just as the federal government had a direct interest in vindicating its own administrative actions to recover delinquent taxes in *Grable*, so too here does the federal government have a direct interest in administering the regulatory system Congress put in place with respect to opioid medications.

The federal issues presented here are important to the federal system as a whole because there is a strong federal interest in ensuring a uniform interpretation of the CSA.  The scope of the obligations the CSA places on distributors of pharmaceuticals—*e.g.*, whether and to what extent it requires distributors to halt "suspicious" orders—is a legal question that has broad significance to the federal government, including by affecting DEA's ability to enforce the CSA and its methods for doing so.  Moreover, the resolution of this legal issue will have application not only in this case, or even in the thousands of opioid-related actions pending in the MDL, but will apply broadly to all cases in which a plaintiff alleges that any distributor of pharmaceuticals breached its alleged duties to report or halt shipments of suspicious orders.  *See, e.g.*, *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 897 (10th Cir. 2017) (concluding plaintiffs' attempts to privately enforce the federal

CSA to enjoin Colorado's marijuana law "raise, at minimum, 'substantial question[s] of federal law'" on the merits that were sufficient for the district court to have exercised jurisdiction over the preemption claims in their entirety under section 1331 (citation omitted)).

Courts have often found federal issues to be sufficiently substantial when they raise "questions [that] involve aspects of . . . complex federal regulatory scheme[s] . . . as to which there is a serious federal interest in claiming the advantages thought to be inherent in a federal forum." *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 195 (2d Cir. 2005) (quoting *Grable*, 545 U.S. at 313). Such rulings are especially common where, as here, federal agencies are responsible for implementing a national regulatory system for which uniformity is essential. In *NASDAQ OMX Group, Inc. v. UBS Securities, L.L.C.*, for example, the Second Circuit ruled that "the disputed federal issue in th[e] case—whether [the defendant] violated its Exchange Act obligation to provide a fair and orderly market in conducting an IPO—is sufficiently significant to the development of a uniform body of federal securities regulation to satisfy the requirement of importance to 'the federal system as a whole.'" 770 F.3d 1010, 1024 (2d Cir. 2014) (citation omitted). Likewise, in *New York ex rel. Jacobson v. Wells Fargo National Bank, N.A.*, the Second Circuit held that "minimizing uncertainty over the tax treatment of mortgage-backed securities, as Congress intended, fully justif[ied] resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." 824 F.3d 308, 318 (2d Cir. 2016) (citation omitted).

Similarly, Plaintiffs' claims require a court to determine the existence and scope of Walmart's obligations under the CSA, implicating the uniformity concerns addressed above. The CSA was enacted to "provid[e] the legitimate drug industry with a unified approach to narcotic and dangerous drug control." H.R. Rep. No. 91-1444 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4566, 4572. Plaintiffs' claims thus "involve aspects of the complex federal regulatory scheme

applicable to" the national prescription drug supply chain, *Broder*, 418 F.3d at 195, and are "sufficiently significant to the development of a uniform body of [controlled substances] regulation to satisfy the requirement of importance to 'the federal system as a whole,'" *NASDAQ*, 770 F.3d at 1024 (citation omitted).  Resort to a federal forum is particularly warranted here because Plaintiffs' action is but one of more than 2,800 substantially similar cases, the majority of which are pending in the Opiate MDL.  If this case proceeds in federal court and is transferred to the Opiate MDL, that court will ensure uniform construction and application of the CSA and any alleged duties arising under the CSA, thus achieving Congress's goal of a "unified approach" to regulating controlled substances.[11]

Additionally, allowing a state court to resolve state-law claims premised on purported violations of the CSA—and to determine the existence and scope of any alleged duties under the CSA—creates the potential for inconsistent interpretations of the CSA across jurisdictions.  *See* 21 U.S.C. § 903 (stating that although Congress did not intend to "occupy the field" of controlled substances regulation with the CSA, the CSA preempts inconsistent state law).  State courts issuing conflicting interpretations of the CSA would inevitably undermine the federal government's efforts to enforce the statute, and would also sow confusion among federally regulated entities.

Plaintiffs' attempt to enforce the CSA raises a substantial federal question even though the CSA does not provide for a private right of action.  In *Grable*, the Supreme Court held that lack of a federal cause of action does not foreclose federal-question jurisdiction.  The Court stated that

---

[11] The federal government has made clear the effect that the opioid litigation will have on its ability to enforce the CSA.  The Department of Justice filed a Statement of Interest on behalf of the United States in the MDL proceedings, asserting the federal government's interests, among other things, its "law enforcement and legal activities in conjunction . . . with the multidistrict litigation," specifically including "[c]riminal and civil tools available *under the Controlled Substances Act*."  *In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-02804, ECF No. 161 at *7 (N.D. Ohio Mar. 1, 2018) (emphasis added).

applying *Merrell Dow* too narrowly would both "overturn[] decades of precedent," and "convert[] a federal cause of action from a sufficient condition for federal-question jurisdiction into a necessary one." *Grable*, 545 U.S. at 317 (footnote omitted); *see also, e.g.*, *Ranck*, 2017 WL 1752954, at *4–5 (concluding state law claims based on violations of Cable Communications Policy Act raise substantial federal questions and satisfied *Grable* even though no private right of action exists under Act). Indeed, in *Wullschleger* the Eighth Circuit concluded that plaintiffs raised a federal-question under the FDCA, even though "Congress[] refus[ed] to create a federal private right of action for FDCA claims." 953 F.3d at 521.

Finally, Plaintiffs suggest the federal question in this case is not "substantial" because "the requirements at issue have been well-established for years" and present the court with a "fact-bound inquiry." ECF No. 7 at *12–13. That is simply not true. The scope of Walmart's purported obligations under the CSA and its implementing regulations raises numerous legal issues, none of which are "well-established." Indeed, Plaintiffs in the Opiate MDL (again, represented by the same counsel as here) brought a motion asking Judge Polster to assess and determine what those requirements are. *See In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-02804, ECF No. 1887 (July 19, 2019). In their supporting brief, plaintiffs explained that there was a "legal dispute over the scope of" the CSA's requirements that "must be resolved before the Court can determine factually whether any of the Defendants are in compliance." *Id.*, ECF No. 1887-1 at *1. Judge Polster has issued multiple opinions on the topic. *See, e.g.*, *id.*, ECF No. 2483 (Aug. 19, 2019).

The federal issue here is central to the dispute, and should be determined by a federal court.

**D.   Resolving this case in federal court will not disrupt the federal-state balance.**

The federal issue is capable of resolution in federal court "without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258.

There is no doubt that federal jurisdiction over this action is proper and in no way impacts

the Congressionally approved balance of federal and state judicial responsibilities. Federal courts exclusively hear challenges to DEA authority to enforce the CSA against distributors and manufacturers, and litigating this case in a state court runs the risk of the state court applying federal requirements in tension or conflict with the way the federal agency tasked with enforcing the CSA—the DEA—applies them. Federal jurisdiction is therefore properly exercised under 28 U.S.C. § 1331 to resolve "disputed issues of federal law" under the CSA.

Moreover, federal courts are *already* the exclusive fora for determining the permissible scope of restraints on Distributors under the federal CSA. Federal courts exclusively hear challenges to DEA authority to enforce the federal CSA against distributors.[12] Similarly, federal courts have jurisdiction over proceedings seeking to enjoin violations of the CSA. *See* 21 U.S.C. § 882(a) ("The district courts of the United States and all courts exercising general jurisdiction in the territories and possessions of the United States shall have jurisdiction in proceedings . . . to enjoin violations of this subchapter."). Thus, the questions presented in Plaintiffs' Complaint are precisely those over which federal courts already exercise jurisdiction.

## CONCLUSION

Walmart respectfully requests that this Court grant its Stay Motion. *See* ECF Nos. 15–16. To the extent this Court considers Plaintiffs' Motion to Remand at this time, Walmart respectfully requests that this Court deny Plaintiffs' motion and exercise subject-matter jurisdiction over this matter.

---

[12] *See, e.g.*, *PDK Labs. Inc. v. U.S. DEA*, 362 F.3d 786 (D.C. Cir. 2004) (hearing challenge to DEA program enforcing CSA to prevent diversion of ephedrine); *Admin. Subpoena Walgreen Co. v. U.S. DEA*, 913 F. Supp. 2d 243 (E.D. Va. 2012) (resolving registrant's motion to require DEA to return subpoenaed documents); *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203 (D.D.C. 2012) (hearing challenge under Administrative Procedure Act to DEA order suspending registration of distribution facility).

DATED:  September 8, 2020

John E. Tull III (84150)
R. Ryan Younger (2008209)
QUATTLEBAUM, GROOMS & TULL PLLC
111 Center St., Ste. 1900
Little Rock, Arkansas 72201
Tel: (501) 379-1705
Fax: (501) 379-3805
jtull@qgtlaw.com
ryounger@qgtlaw.com

Vincent O. Chadick (94075)
QUATTLEBAUM, GROOMS & TULL PLLC
4100 Corporate Center Drive, Suite 310
Springdale, Arkansas 72762
Tel: (479) 444-5200
Fax: (479) 444-6647
vchadick@qgtlaw.com

Christopher Lovrien*
Erin L. Burke*
JONES DAY
555 S. Flower St., 50th Floor
Los Angeles, CA 90071
Tel: (213) 489-3939
Fax: (213) 243-2539
cjlovrien@jonesday.com
eburke@jonesday.com

*Pro hac vice motion pending.

Counsel for Defendants Walmart Inc., Wal-Mart Stores East, LP, WSE Management, LLC, WSE Investment, LLC, and Wal-Mart Stores East, LLC